Savings Bank of Louisville's Assignee v. Caperton.

# Savings Bank of Louisville's Assignee v. Caperton.

# Myer, &c., v. Caperton, &c.

### APPEALS FROM LOUISVILLE CHANCERY COURT.

1. PARTIES TO ACTIONS.—Where loss has resulted from the negligence of the directors of a bank, the bank or its assignee, and not the depositors, is the proper party-plaintiff, unless it plainly appears that a cause of action exists and that the bank refuses to bring the action.

2. DUTIES AND LIABILITIES OF BANK DIRECTORS.—The directors of a bank are not liable for loss resulting from the frauds of an officer of the bank unless they have been guilty of gross neglect, which means an absence of that diligence that ordinarily prudent men in the conduct of such business would have exercised.

3. SAME.—A bank director is not required to be either an expert·or a competent book-keeper, or do more in the general management of the bank with reference to its cashier and book-keeper, whom they have used proper care in selecting, than to see that the daily or weekly statements made to the board, as the case may be, correspond with the general balances upon the books; and this, connected with the periodical count of the money, notes, bonds, etc., is all the supervision required, unless there is some reason for suspecting that the cashier is neglecting his duties.

    In this case it is held that the directors are not liable for their failure to detect fraudulent entries made by the cashier in the books extending through a period of nine years.

4. SAME.—It is the duty of the directors to use ordinary diligence in the selection of all the officers necessary to carry on the business of the bank, which they seem to have done in this case.

5. SAME.—Where one bank was merged into another, the president of the new bank was properly selected by the directors to transfer the balances from the books of the old bank to. the books of the new, and although the president was at the time a defaulter as an officer in the old bank, yet as there was nothing to excite any suspicion as to his honesty, the directors were not guilty of negligence in permitting him to use the books of the old bank for the purposes of the new, instead of making a transfer to a new set of books.

6. SAME.—The directors were not guilty of negligence in allowing the same person to act as cashier, book-keeper and teller. Nor were they

Savings Bank of Louisville's Assignee v. Caperton.

negligent in placing bonds in the custody of a New York bank for the purpose of enabling their bank to draw upon the New York bank; and although the bonds were afterwards hypothecated with that bank for money loaned the cashier of the former bank, the directors are not liable.

7. SAME.—As the bank was in the habit of investing in bonds, the directors were not negligent in failing to discover that bonds exhibited by the cashier as part of the assets of the bank were the property of one of their number who was absent.

8. SAME.—In an action by depositors against a bank the fact that the misappropriation of funds by the cashier was unknown to the directors constitutes no defense to the bank, the presumption being that the directors knew every entry made by the subordinate officers in the bank; but in an action against the directors to make them personally liable no such presumption exists, and the burden is on the creditor to show a want of diligence on the part of the directors in discovering or preventing the fraud.

ROZEL WEISSINGER for ASSIGNEE OF SAVINGS BANK.

1. The question is, what duty did the directors owe? and not as to the *degree* of negligence. The law can do no more than to ascertain that the defendant failed in his duty. It is not necessary or profitable to discriminate as to the degrees or differences in his negligence. (Wilson v. Brett., 11 M. & W., 115; Wyld v. Pickford, 8 M. & W., 461; Grill v. Iron Co., L. R., 1 C. P., 614; Hunton v. Dibbon, 2 Q. B., 646; Steamboat v. King, 16 How., 474; R. R. Co. v. Derby, 14 How., 486; 2 Kent, 560.)

2. Classification of cases on the liability of bank directors:

(a.) Where the director does some act with respect to property of the corporation, or makes some contract with or for the corporation, by which the director is individually benefited at the expense of the corporation, or where he is guilty of reckless mismanagement of the corporation's property. All such are cases of fraud, and the director is held liable as a trustee. (Charitable Corporation v. Sutton, 2 Atk., 405; Smith v. Robinson, 3 Paige, 231; Board of Commissioners, &c., v. Reynolds, 44 Ind., 513; Koehler v. Black River Co., 2 Black, 720; Dury v. Cross, 7 Wall., 302; Bradley v. Farwell, 1 Holmes, 437; Sawyer v. Hoag, 17 Wall., 620; Corbett v. Woodward, 5 Sawyer, 417; Coal & Iron Co. v. Parish, 42 Md., 598.)

(b.) Where the loss arises from exceeding, or failing to comply with, charter provisions, or from bad investments, etc. In all such cases where the illegal act done was committed through a mistake of law, or where the bad investment arose from a *bona fide* mistake of judgment, the directors are excused. (Spering's Appeal, 71 Pa. St., 11; Godbold v. Bank of Mobile, 11 Ala., 149; Scott v. De Peys-

Savings Bank of Louisville's Assignee v. Caperton.

ter, 1 Edw. Chan'y, 513; Vance v. Phœnix Ins. Co., 4 Lea, 385; Hun v. Cary, 82 N. Y., 71; Percy v. Millandon, La. Con. R., vol. 4, N. S., 430; Hodges v. New England Screw Company, 1 R. I., 312; 3 R. I., 9.)

(c.) Where loss has arisen through the negligence of the directors; as where an embezzlement has occurred by an officer, or some other loss of property, by reason of the negligent and insufficient supervision of the directors. (Dunn v. Kyle, 14 Bush, 134; Shakers v. Underwood, 9 Bush, 609; Scott v. De Peyster, 1 Edw. Chan'y, 513; Manhattan Co. v. Lydig, 4 Johns., 376.)

As to liability of bank directors, see also: Turquand v. Marshall, L. R., 4 Ch. App., 376; 2 Pomeroy's Equity, note, sec. 1070, page 642; Graves v. Lebanon Nat. Bank, 10 Bush, 30; Jones v. Johnson, 10 Bush, 658; Swigert v. Graham, 7 B. M., 663; Smith v. Prattville Co., 29 Ala., 509; Morse on Banking, 117; Thompson on Officers and Agents Corp., 357; Colt v. Wallaston, 2 P. Wms., 153.)

3. The duty owed by directors of a bank is to the corporation. For a breach of that duty they are liable to the corporation. Where the corporation has made an assignment, any right of action against the directors passes to the assignee. Neither a creditor nor a stockholder can sue the directors, unless it appear that the corporation, being under the control of the delinquent directors, will not sue, or, where an assignment has been made, the assignee refuses to sue. (Zinn v. Mendell, 9 W. Va., 580; Jones v. Johnson, 10 Bush, 660; Hodge v. New England Screw Co., 1 R. I., 312; 3 R. I., 9; Allen v. Curtis, 26 Conn., 461; Smith v. Poor, 40 Me., 415; Smith v. Hurd, 12 Met., 371; Brinkerhoff v. Bostwick, 88 N. Y., 52; Greaves v. Gouge, 69 N. Y., 157; Robinson v. Smith, 3 Paige, 231.)

4 It was necessary for the appellees, Myers, &c., to have shown a *bona fide* effort to get the assignee to sue, and an unqualified refusal on his part. (Detroit v. Dean, 106 U. S., 537; Humes v. Oakland, 104 U. S., 401.)

5. The Savings Bank was a necessary party to the suit by Myers, &c. The bank not having been made a party defendant, no cause of action was stated in the petition. (Shawhan v. Zinn, 79 Ky., 300; Davenport v. Dawes, 18 Wall., 626; Greaves v. Gouge, 69 N. Y., 157; Robinson v. Smith, 3 Paige, 231.)

6. The suit being in behalf of the directors in the savings department only, and no relief having been asked for the other depositors, general creditors or stockholders, the petition was fatally defective.

ALEX. P. HUMPHREY of counsel on same side.

B. F. BUCKNER for MYERS *et al.*

1. Directors of a bank are liable for failure to use ordinary care and diligence, and they cannot be heard to say that they were ignorant of

Savings Bank of Louisville's Assignee v. Caperton.

facts which appeared from entries on the books of the bank. (Shakers' Case, 9 Bush, 621; Percy v. Millandon, 8 Mart. (N. S.), 68.)

The failure of the directors in this case to have the ordinary methods of book-keeping observed; consolidating all the duties of cashier, teller and book-keeper in one person; permitting that person to make "statements" of the condition of the bank on slips of paper, which were accepted as true without any attempt at verification; counting the cash on stated days known beforehand to the cashier, and basing their count on the assumption that the cashier had correctly furnished the amount he ought to have; never during the existence of the bank making any examination of the books to see if they agreed with each other, thus virtually surrendering the whole management and direction of the bank into Rhorer's hands, was culpable negligence.

2. The judgment determining that Jones, the assignee, had no right to sue was a final order, and he, having failed to prosecute an appeal therefrom within the time allowed, cannot now question the correctness of that ruling. (Helm v. Short, 7 Bush, 625, Maysville & L. R. R. v. Punnett, 15 B. M., 48; Turner v. Browder, 18 B. M., 826; Robinson v. Scott, 3 Litt., 233; Garrison v. Singleton, 5 Dana, 161; May v. Hardin's Ex'r, 13 B. M., 346; Offutt v. Bradford, 4 Bush.)

3. The action in behalf of creditors should have been brought by the assignee, Jones, but he having *refused* to sue, Myers and others had the right to sue.

JAMES SPEED, A. BARNETT AND THOMAS AND JOHN SPEED
FOR APPELLEES.

1. Directors of a corporation are only required, in the management of its affairs, to keep within the limits of the power conferred upon them, and to exercise good faith and honesty. Unless there is shown to be a want of good faith or a willful abuse of discretion there will be no personal liability. (Field on Corporations, sec. 169; Dunn v. Kyle, 14 Bush, 134; Spering's Appeal, 21 Penn. St., 11; Scott v. De Peyster, 1 Edw. Ch'y, 526; Hodges v. New England Screw Co., 1 R. I., 312; Wakeman v. Dalley, 51 N. Y., 57; Manhattan Bank v. Lydig, 4 Johns. Rep., 347; Smith v. Prattville Man'f'g Co., 29 Ala., 504; Watts' Appeal, 78 Penn. St., 370; Turquand v. Marshall, 6 Law Rep., Equity Cases, 112; Overend, &c., v. Gibb, 4 Law Rep., Ch. Cases, 701; s. c., 4 Law Rep., 5 H. L, 480; Thompson on Liability of Officers of Corp., pp. 358, 359, 360, notes.)

In every case where directors have been held liable it was because they were the wrong-doers themselves, not because others had done wrong. (Bank v. Hill, 56 Me., 385; Charitable Corp. v. Sutton, reported in Thompson on Liability of Officers of Corp., 227; Shea v. Malry, 1 B. J. Lee, Tenn., 344; Percy v. Millandon, 8 Martin, 68; s. c., 3 La., 568; Attorney-General v. Wilson, 1 Cr. and Ph., 1; Butts

v. Wood, 38 Barb., 181; Attorney-General v. Corp. Leicester, 7
Beavan, 176.)

2. The court will not look to cases which hold that a bill charging gross
neglect is a good bill on demurrer, as: Shakers v. Underwood, 9
Bush, 609; Robertson v. Smith, 3 Paige, 222; Brinkerhoff v. Bost-
wick, 85 N. Y., 52; Maisch v. Savings Fund, 5 Phila., 30; Sears v.
Hotchkiss, 25 Conn., 171.)

Nor to cases which hold that suits against directors on the ground
of negligence belong in equity, as: Smith v. Hurd, 12 Met. (Mass.),
371; Zinn v. Mendell, 9 W. Va., 580; Allen v. Curtis, 26 Conn., 456;
Futz v. Shaunhurst, 69 Mo., 265; 34 How. Pr., 180.)

But to cases tried and decided *on their merits*.

3. The character of negligence that would render directors liable, in the
absence of fraud or positive misconduct, is that which is known as
gross.    (Morse on Banking, p. 450.)

Gross negligence defined.    (Sher. and Red. Neg., sec. 18; Story,
Bail., sections 17-22; L. & N. R. R. Co. v. Robinson, 4 Bush, 509.)

4. The directors were not obliged to know of the falsification of the books
by Rhorer.    (Bachelor v. Planters' Bank, 78 Ky., 446; Ackerman v.
Halsey, 17 Cont. Law J., 433.)

This was not a case in which the falsification of the books could
have been discovered by a cursory examination, as was the case in
Graves v. Lebanon Bank, 10 Bush, 23.

5. In a controversy between the bank itself and a creditor the law in-
dulges certain presumptions against the bank.    It *presumes* directors
know all that is going on.    (Bank U. S. v. Danbridge, 12 Wheat., 64;
Morse on Banking, 91-107.)    But there is no such presumption where
directors are sought to be held personally liable.

CHIEF JUSTICE PRYOR DELIVERED THE OPINION OF THE COURT.

This action was instituted by Gustave Myers and
others against the President and Directors of the Lou-
isville Savings Bank, to recover the various sums due
to them as depositors in its savings department, the
loss having been caused from the embezzlement of
the funds of the bank by J. H. Rhorer, the cashier.
The ground of recovery is the alleged negligence of
the directors in the general conduct of the bank, and
particularly in their failure to inspect the books of
the bank, and a want of diligence in supervising the
acts of their subordinate, the cashier.

The bank by reason of the defalcation was rendered insolvent, and an assignment made in January, 1880, of all of its assets to the appellant Jones. The creditors of the bank filed their petition in equity, alleging that Jones, the assignee, refused to sue the directors, or to unite with them in the action.

Jones was made a defendant to the action, and by a cross-petition sought to recover of the directors for the default of Rhorer, on account of their negligence with reference to the affairs of the bank, alleging that he had delayed the litigation for the purpose of ascertaining the condition of the bank, and the facts, if any, upon which a recovery could be had against the directors.

A controversy originated in the court below as to the right of Jones to maintain this cross-action, and on motion of the creditors they were alone allowed to prosecute the cause of action set up in the original petition, and the claim of the assignee, in so far as it affected the depositors, was dismissed.

It is not necessary, in the light of the facts presented, to discuss the right of either Jones or the creditors to maintain the action further than to say that the bank or its assignee is the proper party-plaintiff in such cases, unless it plainly appears that a cause of action exists and the bank refuses to bring the action. We will proceed, therefore, to consider this case on its merits.

The corporation, the Louisville Savings Bank, was organized in the year 1866, and was the successor of a bank called the Louisville Savings Institution, the former having been merged in the latter by taking

all of its assets and assuming all of its liabilities. An election of directors was held in August, 1866, and James Guthrie, Joshua F. Speed, James W. Henning, Milton H. Rhorer and Jonas H. Rhorer were selected. The directors then elected J. H. Rhorer, the subsequent defaulting cashier, president, and Thomas Barclay cashier; and when this was done, directed the president and other officials to have the balances on the books of the old bank transferred to the books of the new bank. Guthrie died in April, 1869, and John Caperton was made director in his stead. In 1871 J. H. Rhorer resigned as president, and was made cashier, Barclay having ceased his connection with the bank. Caperton was then elected president. In 1874 M. H. Rhorer resigned as director, and Andrew Sabine placed in his stead.

From the first of January, 1871, J. H. Rhorer filled the place of cashier, teller and book-keeper in the commercial or general department of the bank. The bank had two departments in the same building, one known as the savings department, and the other as the general or commercial department, both regarded, however, as the one bank, and money often transferred from one department to the other.

The directors sought to be made liable are Caperton, Henning, Speed and Sabine, the fifth director being J. H. Rhorer.

The books of the general department were kept by Rhorer, and of the savings department by Joshua F. Speed, Jr. In the year 1872, shortly after Rhorer was elected cashier, the bank built what is termed a safety vault, at a cost of fifty-five thousand dollars.

The capital stock of the bank was only one hundred thousand dollars, one-fifth of which was owned by J. H. Rhorer, the cashier.

Rhorer was not only the cashier and the one-fifth owner of the stock, but, as is manifest from the proof in this case, was the leading spirit in directing and controlling the affairs of the bank during the series of years in which he was engaged in making fraudulent entries in the books of the bank to enable him to appropriate its funds to his own use. His entire administration of the affairs of the bank evidences a systematic purpose in embezzling the funds of the institution, and betraying an almost unlimited confidence placed in him by the directors. It was not until the month of January, 1880, that the frauds were discovered, although practiced for the nine years he was cashier, and long before, and then made known by the written acknowledgment of Rhorer, found with the papers of the bank, to the effect that he had been robbing the bank, and had surrendered himself into the custody of the law.

The investigations and settlements made since the assignment show the defalcation to be one hundred and eighteen thousand dollars.

The only question presented in this case is, whether the directors acted in good faith and with ordinary care and diligence in conducting the affairs of the bank, or such diligence as ordinarily prudent men would have exercised with reference to the conduct of such a moneyed institution. It is not a question as to how the frauds of the cashier might have been discovered, but were these directors guilty of gross neg-

lect, which means an absence of that diligence—that ordinarily prudent men in the conduct of such business would have exercised.

The directors received no compensation for their services, the benefits to be derived by them from the profits of the bank flowing solely from their interests as stockholders. If their liability is to be measured by that imposed upon the president, or the director, who receives as compensation a sum equivalent to an undertaking to supervise the entire affairs of the bank by an actual inspection and examination of the accounts and books of the bank, as well as the other duties pertaining to such a position, then there would be no question as to the liability of the appellees in this case; but with services rendered that are merely gratuitous, or at least without reward, it can not be held that a liability is to be fixed upon them for no other reason than their failure to detect the fraudulent entries made by the cashier in the books of the bank, although extending through a period of nine years.

The facts, however, presented by this record, must determine the question of negligence, or the want of diligence on the part of the appellees.

It was incumbent on the directors to appoint all the officers necessary to carry on the business of the bank, and to use ordinary diligence in the selection of men qualified to fill such positions.

In the year 1871, when Rhorer was elected cashier of the bank, and also made its book-keeper, his past life as a business man, so far as then known, was a sufficient guaranty to the directors of his honesty and

capacity for the position. He had been made president of the bank at its organization in 1866, with, as the proof shows, some of the most successful business men in Louisville as the directors, Guthrie, Speed and Henning. His experience in banking, as well as his high character for integrity, both personal and financial, commended him to all business men as well qualified for such a position. There was no reason for suspecting his fidelity to his co-directors and to the interests of the bank whose affairs he had been called on to manage, and yet he was, at the time he was elected president of the Savings Bank, a defaulter in the Savings Institution, that had been merged into the former bank, in the sum of seventeen thousand dollars.

It is insisted, as one of the grounds for imputing negligence to the directors, that Rhorer, who had been elected president of the Savings Bank, and was directed to transfer the balances from the books of the Savings Institution to the new bank, failed to open new books, but continued to use the old books, and especially the individual ledger containing the accounts of depositors in the Savings Bank, until its suspension in the year 1880. That this aided Rhorer to cover up his defalcation in the old bank, and to practice his frauds in the new bank, when, if the accounts on the old books had been balanced, and the proper entries made in the new books, the fraud already practiced might have been detected. That a proper and thorough examination of the accounts of the Savings Institution would have been the safest method for these directors to have pursued, with new

accounts opened for depositors, must be readily conceded; but Rhorer having been cashier of the old institution, and having at the time of the merger of the two banks been elected president of the Savings Bank, it was not unreasonable, but consistent with the duty these directors owed to all interested, that Rhorer should have been selected to make the transfer, and to pursue that course that in his judgment was proper in opening the books for the new bank.

There was nothing to excite the least suspicion as to his honesty, and it can not be regarded as neglect on the part of the directors in permitting him to use the books of the old for the purposes of the new bank.

If balances had been struck and transferred from the old set of books to the new, the fraud already practiced would necessarily have entered into the books of the new bank, as Rhorer, who was directed to make the transfer, would scarcely have made entries that would have resulted in an exposure of his fraudulent practices.

The frauds perpetrated by the cashier in abstracting the money of the bank were committed in various ways. First. Where deposits in certain instances were made he would credit them on the individual ledger, but make no charge of them on the blotter. In one instance the Louisville Steel Works is credited on the individual ledger with five thousand dollars, and this sum not credited to the concern, or charged to cash on the blotter. Again, the same party is credited by several items, amounting to two thousand seven hundred and nineteen dollars, in the same way.

Second. The blotter shows a deposit on January 25, of three thousand eight hundred and ninety-eight dollars and fifty cents, and on that day Rhorer and Cotton are credited with that amount on the individual ledger. On the same day the Metropolitan National Bank of New York is credited on the blotter with six thousand one hundred and one dollars and fifty cents. These two items amount to ten thousand dollars, and the bank on the general ledger is credited by ten thousand dollars. It appears that the Metropolitan Bank was entitled to a credit of ten thousand dollars, when Rhorer only placed to its credit six thousand one hundred and one dollars and fifty cents, and gave credit to Rhorer and Cotton for three thousand eight hundred and ninety-eight dollars and fifty cents, when no such deposit had been made, but by crediting the bank's account in the ledger with the true amount, ten thousand dollars, the accounts appeared correct, and enabled the cashier to appropriate three thousand eight hundred and ninety-eight dollars and fifty cents to his own use. Another instance is where Rhorer is credited on the blotter with three hundred and fifty dollars, and this sum is posted to his account in the individual ledger as two thousand three hundred and fifty dollars.

Again, he would charge a depositor on the blotter with a certain sum as if paid on the depositor's check. This sum would be posted to his account on the individual ledger, and when balancing the account, the item would be omitted from the addition. This character of fraudulent entries in the books of the bank was practiced from the year 1871 until the close of

the bank in January, 1880, the amount of defalca-
tion concealed by the fraudulent entries amounting
in the aggregate to near, if not quite, sixty thousand
dollars, with the cash found short in the sum of fifty-
eight thousand dollars.   The entire defalcation was one
hundred and eighteen thousand two hundred and
twenty-eight dollars and fifty-seven cents, as reported
by the expert accountants in the examination made
of the bank accounts.

The principal grounds relied on for a reversal in
this case are: First, that the directors, in giving to
Rhorer the sole control of the books of the bank,
making him cashier, book-keeper and teller, placed
it within his power to perpetrate the fraud, and for
that reason they were guilty of such neglect as make
them responsible to the bank.   Second, they failed
to make proper examinations as to the condition of
the bank, and allowed the books to be falsely kept.
We have said that it was their duty to exercise that
reasonable and ordinary care with reference to the
affairs of the bank that ordinarily prudent men would
exercise in reference to such business affairs.   If it
was the duty of the directors to examine the books
of the bank in the absence of any reason for sus-
pecting the honesty of the bank's cashier, with a view
of testing their correctness with the weekly statements
made them, or when making their periodical investi-
gation of the money on hand, and the notes, bills
and bonds belonging to the bank—it being manifest
that the frauds could have been easily discovered at
least by a book-keeper of ordinary intelligence—their
responsibility would necessarily follow.   It is difficult

to define each and every duty pertaining to such a position, but we are satisfied that a bank director is neither required to be an expert, or a competent book-keeper, or do more in the general management of the bank, with reference to its cashier and book-keeper, than to see, in the absence of any reason for doubting his fidelity to the trust confided to him, that the weekly, daily or monthly statements made to the board correspond with the general balances upon the books. In this case the weekly statements as to the cash on hand, bills discounted, etc., corresponded with the cash account as it appeared each day, or at the time the statement was made, with the cash account on the teller's blotter, where, as in this case, the cash account was kept. It is argued, however, and the expert so states, that these frauds could have been readily de-tected by comparing a balance on the individual ledger with the amount stated to be due depositors in Rhorer's weekly statements. It is plain that any director, if at all conversant with book-keeping, could have gone to the individual ledger, and running over the accounts of depositors, and then comparing that with the blot-ter ending each day's transactions, could have discov-ered the fraud; or it might have been discovered by ascertaining the amount due each depositor, as ap-peared from that book; but we know of no rule of law or reason that would require such an investigation by directors, and to hold them responsible for failing to discharge such a duty would be imposing a respon-sibility that no business man would assume, without a compensation commensurate with the labor required.

If they have selected a cashier and book-keeper,

regarded at the time as qualified for the position assigned, or· used reasonable care and precaution in making the selection, and taken from him a bond in an adequate penalty for the faithful discharge of his duties, his weekly or daily statements, as the custom of banks may be, agreeing with the balances as found on his books, connected with the periodical count of the money, notes, bonds, etc., is all the supervision required, unless the directors have some cause for suspecting, or see that he is neglecting his duties.

In the present case the cashier made weekly statements to the directors that were compared with the cash balances and found correct, or if not compared at the time, those statements agreed with the general balance found on the books, that were, however, false and erroneous by reason of fraudulent entries and forced balances. They examined the general condition of the bank once in every six months, by making an actual count of the cash, and ascertaining the amount of bills, notes, bonds and securities on hand, all of which agreed with the statements made by the cashier and verified by the general balance found on the books.

It is argued, however, that as one of the means of preventing such defalcations it is prudent to have different employes in charge of the books, as checks upon each other, and not intrust those duties to one man. This, no doubt, is the safest course to pursue so as to prevent fraud and have perfect accuracy in the accounts ; but the fact that these directors saw proper to confide in Rhorer, and permit him to discharge the double duty of book-keeper and cashier, does not evidence a want of ordinary diligence on their part. If

called on to adopt that mode which would approach nearer to absolute security against such thefts than any other, the usual custom in the banks of a city would be adopted; but the question here presented is, were the directors, in making such an employment, doing that which men of ordinary prudence in such business would have regarded as unsafe. We think, measuring the duty of a director by the character of the business he is supervising, the entire testimony in this case gives a negative response to the question. He had been trusted to an unlimited extent, prior to this undertaking, in the conduct of financial transactions involving millions of dollars. He was regarded as a man of means, and worthy of every man's confidence by reason of his supposed great moral worth, as well as his financial standing; and no reasonable man, unless exercising the highest degree of care, under the circumstances, would have supposed that a check on his conduct in the bank was necessary, or that any inspection of the books, by way of detecting errors, was demanded. We therefore see no reason for holding these directors personally liable by reason of frauds concealed by a system of false entries, requiring the skill of expert accountants to ascertain, when no breach of duty on the part of the cashier had been brought home to the directors, and the defalcation resulting in no act of their own. J. F. Speed, Jr., who had charge of the books in the savings department of this bank, was an inexperienced book-keeper at the time of his selection, yet his books were accurate, and his fidelity to the bank and its patrons unquestioned. The evidence of honesty and the utmost good faith was

vol. 87

found on the side of the youthful book-keeper, while a concealment of fraud was being practiced by the shrewd and experienced financier. Henning and Speed, two of the directors, were in the bank daily, aiding in its control and management. They were both business men, with their capital invested in the stock of the institution, and to adjudge that they were indifferent to their own interests or that of the bank, would be a conclusion not sustained by the facts before us.

The case of Dunn's Adm'r v. Kyle's Ex'r, 14 Bush, 134, is very similar in many of its features to the case before us, in which it was held that the directors were not liable to stockholders for the default of the cashier, unless occasioned by their fraud or gross neglect. The absence of ordinary care was attempted to be shown in that case, because of the failure of the directors to discover the fraudulent acts of the cashier, such as required the skill of an accountant to develop.

Where directors, by their own act, cause the loss to the bank or the corporation they represent, no doubt as to their liability can arise. Where they discount paper known to be worthless, or cause the cashier or other officer of the bank or corporation to do that which is forbidden by the charter, and loss arises, they will be held responsible. (Spering's Appeal, 71 Pa. St., 11; United Society of Shakers v. Underwood, 9 Bush, 609; Bank v. Hill, 56 Me., 385.) Here the directors are charged not with any wrongful act of theirs by which loss has been sustained, but for neglect in failing to do that which they ought to have done. They were ignorant of the thefts being committed, but it is

alleged they could have discovered the fraud by the exercise of ordinary diligence. If this action was against the bank, it would not be allowed to say that its directors were ignorant of these frauds, for in such a case the law presumes that the directors know every entry made by its subordinate officers in the bank books, and, therefore, the misappropriation of funds by a cashier, unknown to the directors, constitutes no defense to the bank; but in an action against the directors to make them personally liable, no such presumption exists, and the burden is on the creditor of the bank to show a want of diligence on the part of the directors in discovering or preventing the fraud. The directors are under no personal liability to the creditors of a bank by reason of a neglect of duty. They are the agents of the corporation, and could only be sued in this case by the creditor because of the refusal of the assignee to sue. They may be proceeded against personally for a conversion of special deposits by them, because guilty of a tort, as in the case of Shakers v. Underwood, 9 Bush, 609; or in a case where the president and directors are the parties to be charged, there is no reason why the creditor may not sue, making the bank and the directors defendants.

So at last it is the bank suing the directors in this case for a neglect of duty; and if there were no depositors, could the bank claim that the directors were guilty of neglect in permitting Rhorer to act as cashier and book-keeper, or in failing to detect the frauds so manifest after the discovery? We think not.

The appellants also say that the directors were guilty

of neglect in placing certain United States bonds, amounting to thirty-three thousand dollars, in the custody of the Metropolitan Bank, in the city of New York, that were afterwards hypothecated with that bank for money loaned to Rhorer, without the knowledge of the directors.

These bonds belonged to the savings side of the bank, the books of which were under the control of Joshua Speed, Jr. This book-keeper reported in his statements these bonds as belonging to the savings side of the bank, and the directors believing them perfectly secure, and having placed them with that bank to enable the bank at Louisville, as Henning states, to draw upon the New York bank whenever it might need money, made no inquiry as to any use that might have been made of them by its bank officers. They had no reason to believe that Rhorer had pledged them as collateral to raise money, that he might increase the fund in the home bank upon which to plunder; and we perceive no reason for holding them guilty of an imprudent act in depositing them with the New York bank for the purposes mentioned by Henning, one of the directors. They, it is true, might have suspected Speed of using them for his purposes if his honesty had ever been questioned or doubted by them, or they might have suspected Rhorer of stealing the bonds from Speed or the New York bank; but as no cause existed for suspecting either of the book-keepers, the depositing of the bonds with the bank in New York did not constitute any character of neglect, as it was proper that they should do so under the circumstances.

In regard to the Semple bonds belonging to Caperton, and that were used in his absence in the statements as to the condition of the bank by Rhorer as assets of the bank, it appears that the bank was in the habit of investing in bonds, and whether these bonds were all of the series of the Semple bonds does not appear. Rhorer exhibited them to the other directors as belonging to the bank, and how they were to know they had been charged to the account of Caperton is difficult to perceive. They did not suspect Rhorer of deception. The bonds were in the vaults of the bank, and exhibited as part of the assets. If it was their duty to examine Caperton's account in order to prevent fraud on the part of the cashier, their liability might be asserted; but even if Caperton had been present, with a series of bonds of a like character, he would doubtless have not suspected Rhorer of using his bonds as assets of the corporation. Nothing occurred during the interval between 1871 and 1880 that called the attention of the directors to the individual ledger, or to a minute examination of any book connected with the corporation.

In the case of Scott v. De Peyster, 1 Edwards' Chancery Reports, 513, the cashier or treasurer of the corporation embezzled the funds by a series of frauds running through several years in a manner much like the cashier did in this case. The stockholders attempted to make the directors liable on the ground of neglect, etc. The court, in discussing the facts of that case, said that "such subordinates (alluding to the cashier) must be supposed to act honestly until the contrary appears, and the law does not require

their employers to entertain jealousies and suspicions without some apparent reason." And further said the court: "I think the question in all such cases must necessarily be whether they (the directors) have omitted that care which men of common prudence take of their own concerns."

In the case of the Manhattan Co. v. Lydig, 4 Johnson's Rep., 389, it is said on this question of diligence: "The examinations of the bank by the committee of directors were in the usual way, and the fraud practiced eluded detection by means of a false balance sheet. It is not for the court to point out the mode banks are to pursue to detect frauds; but if they take the usual and uniform method adopted not only by this but by other banks, they can not be subject to the charge of negligence." And if the mode adopted by business men in such cases is to fix the measure of diligence, or determine the question of neglect, as said by Lord Hatherley in Turquand v. Marshall, 4 Law Rep., Chan. App. Cases, 382, then these directors are relieved from liability. Taking the entire testimony of bankers in this case, and these directors were as vigilant, or more so than the directors of other larger moneyed institutions, and to hold them responsible under the facts presented would be to deter business men from accepting the position of a director, when by doing so they are required in effect to insure the honesty of bank subordinates by being made responsible for their fraudulent acts. We have considered other questions of neglect made in this case involving fraudulent overdrafts, and the fact of notice given a man, supposed to be perfectly honest,

of the day on which his money as cashier was to be counted, in all of which we perceive no want of ordinary diligence. These directors were the principal stockholders. Their own interests were involved to a greater extent than that of the depositors. They were business men ; two of them were almost daily at the bank. The assets of the bank will pay eighty or ninety cents to the dollar, and if they paid less it could not affect the question here. They (the directors) have conceded their neglect in the particular of failing to have ample security to the bond of the cashier. They have made that neglect good by accounting to the bank for the penalty of the bond, which was twenty thousand dollars. They have exercised ordinary diligence in the discharge of their official duties, and suffered loss, in common with the appellants, by the frauds of a cashier in whom they all had the right to confide.

The judgment below is affirmed.