NORRIS S. LIPPITT ET AL., RECEIVERS, *vs.* F. L. ASHLEY ET ALS. (No. 534).

NORRIS S. LIPPITT ET AL., RECEIVERS, *vs.* EZRA B. BAILEY ET ALS. (No. 535).

NORRIS S. LIPPITT ET AL., RECEIVERS, *vs.* GEORGE P. CLARK ET ALS. (No. 536).

NORRIS S. LIPPITT ET AL., RECEIVERS, *vs.* JAMES T. COOGAN ET ALS. (No. 537).

First Judicial District, Hartford, January Term, 1915.
PRENTICE, C. J., THAYER, RORABACK, WHEELER and BEACH, Js.

Section 3453 of the General Statutes prescribes that directors of a savings-bank "assenting" to a violation of any provision of law relating to such institution, shall be jointly and severally liable to the bank for any loss which may result therefrom. *Held* that directors could not be said to have "assented" to a violation of law in voting for the payment of dividends which had not in fact been earned, unless they had actual knowledge of that fact, or were negligent in not knowing the real financial condition of the bank, in which case knowledge of the actual facts would be imputed to them in an action to enforce the statutory liability.

In this State directors of savings-banks, whether technically trustees or not, stand in a fiduciary relation to the bank and are bound to exercise reasonable oversight and supervision of the mode or method in which the appointed custodians of its funds conduct their office; and if they neglect their duty in this respect and as a result thereof the funds of the bank are embezzled by one of its officers, the directors are liable for the loss.

The discharge of this duty involves, at least, a compliance with the statutes of the State, with the by-laws of the corporation, and with the usages of the business. Absolute uniformity of usage is not required, but the omission to make use of an ordinary and approved precaution against the known risks of the business is, in the absence of any substitute for such omitted precaution, prima facie evidence of negligence.

Whether a defendant, sued for negligence in his personal and private capacity, has or has not exercised that degree of care which, under

all the circumstances, might reasonably have been expected of an ordinarily prudent man, is, generally speaking, a question of fact. But where the defendants are sued for their negligence as bank directors during a period of forty years, and there are numerous findings, many of which sum up the whole course of the defendants' conduct with reference to some particular line of action or omission, the ultimate finding or conclusion of reasonable care or of negligence is necessarily an inference or deduction from these intermediate generalizations, and, if logically inconsistent with them, may be reviewed in this court.

In the present case the trusted treasurer of a small savings-bank had been misappropriating its funds for nearly forty years, unknown to its directors, until the sums so taken aggregated about $93,000; he had also made false reports to the directors, in consequence of which they had, during that time, declared and paid dividends amounting to nearly $100,000 in excess of earnings. It appeared from the finding that the embezzlements might have been discovered at any time by taking a trial balance of the depositors' ledger, and that it was customary in savings-banks in Connecticut to have such trial balances taken by their treasurers at least as often as every two years. In a suit by the receivers of the bank to recover these losses and illegal dividends, it was *held:*—

1. That the failure of the directors to require any trial balances to be taken was an omission which constituted want of reasonable care.

2. That the reports of the treasurer, of the auditors, and of the bank commissioners, upon which the defendant directors relied as an excuse for their failure, were not trial balances either in form or in substance, furnished no proper substitute for them, and afforded no foundation for the mistaken belief of the directors that the examination and comparisons involved in taking a trial balance had actually been made by these officials.

3. That this neglect or omission of the directors was, under the circumstances of the case, a proximate cause of the losses and of the illegal declaration of dividends.

The directors of a financial institution which has an approved system of double-entry bookkeeping, should make some effort, from time to time, to compare one set of entries with the other, and thus give the institution whatever measure of protection against mistake or dishonesty such a system affords.

The annual audit of a savings-bank required by General Statutes, § 3447, does not relieve the directors of their duty of reasonable supervision, imposed upon them by the common law.

Directors of a savings-bank whose only neglect of duty is their failure tó exercise a reasonable supervision of the conduct of one of the bank's officers and thus prevent a loss of the corporate assets, and who have no actual or constructive notice of any wrongdoing upon his part, ought not to be deprived of their right to plead the

statute of limitations when sued by the receivers of the bank to make good its losses. Such neglect cannot fairly be treated, either upon principle or authority, as a breach of an express or direct trust, against which the statute does not run.

A defendant is not equitably estopped from pleading the statute of limitations, unless his conduct or representations were directed to the very point of obtaining the delay of which he now seeks to take advantage by such plea.

In the present case the receivers of the bank contended that the cause of action was fraudulently concealed, and therefore the running of the statute of limitations was suspended. *Held* that the action was not one in behalf of the depositors but one in behalf of the bank, whose artificial entity as a corporation the court could not disregard; and that inasmuch as the neglect or omissions of the board of directors, acting as such, were necessarily known to the bank as soon as they occurred, there could have been no concealment, actual or constructive, of the cause of action, much less any fraudulent concealment.

Argued January 7th, re-argued May 4th, decided July 16th, 1915.

ACTIONS against directors of a savings-bank to recover losses sustained by the bank through the long-continued defalcations of its treasurer, alleged to have occurred because of the negligence and lack of supervision of the defendants, and also for negligently and illegally declaring and paying dividends which had not been earned, brought to and tried by the Superior Court in Hartford County, *Bennett, J.;* facts found and judgment rendered for the defendants in each case, and appeal by the plaintiffs. *Error and new trial ordered in two cases; no error in the other two.*

These four actions are brought by the receivers of the Windsor Locks Savings Bank against the directors of the bank, arranged in four groups according to their terms of office, to recover damages for the alleged negligence of the directors in permitting the assets of the bank to be stolen by its treasurer, and to recover, under § 3453 of the General Statutes, the amounts of certain dividends declared and paid in excess of net profits. These actions were tried together in the Supe-

rior Court, and were heard together on the appeals from judgments for defendants rendered in each case.

The Windsor Locks Savings Bank was incorporated in 1871, and in that year Alfred W. Converse was elected secretary and treasurer of the bank, an office which he continued to hold until November 28th, 1910, when he resigned. Charles F. Cleveland was elected secretary and treasurer as successor to Converse, and performed the duties of that office until May 17th, 1912, when the plaintiffs were appointed receivers. During his administration of the office of treasurer Converse embezzled approximately $93,000, and also made false reports, to the directors, in consequence of which they declared and paid dividends amounting to nearly $100,000 in excess of earnings.

Converse was a veteran of the Civil War, and a successful business man, postmaster, town clerk, treasurer and registrar of the town of Windsor Locks for many years, and was universally trusted and respected. He received and paid out all moneys of the bank, kept all the books, drew and signed all checks, made out all reports, and, with some clerical assistance, performed all the other clerical duties of the bank.

The bank began as a very small institution and grew gradually, and at the time when the receivers were appointed its deposits were substantially $581,000. During the greater part of its existence its office was in a small room in the Converse Block. It was operated with great care and economy, the total expenses for the whole forty-one years of its existence averaging somewhat over $1,800 a year for rent, salary of treasurer, taxes, and all other general and incidental expenses.

The books of the bank comprised deposit and withdrawal registers, a general ledger, a daily balance book, and depositors' ledgers containing the individual accounts of the depositors. The deposit registers pur-

ported to contain a list of all deposits made by depositors, the name of each depositor, the number of the account to which the same was credited on the individual ledger, and the amount of each deposit, all arranged in chronological order. The total semi-annual dividends credited depositors at any dividend date was also entered in this register in a single lump sum. The items entered on these books were footed continuously from beginning to end, so that the footing at any given date purported to indicate the gross amount of all sums (including both deposits and dividends) credited to depositors from the organization of the bank to the date of such footing. The withdrawal registers purported to contain a list of all sums withdrawn by depositors, showing the day on which such withdrawal was made, the number of the account to which the same was charged on the individual ledgers, the amount so withdrawn, and the signature of the depositor or his agent. These items were also footed continuously from beginning to end, and the footing at a given date purported to indicate the gross withdrawals charged against depositors from the organization of the bank to the date of such footing. In the general ledger the gross deposits and gross withdrawals, gross income received from interest, and all other items of receipt and expense, were entered from time to time. With the exception of the entries in the expense account the items in this ledger are not self-explanatory, but were carried into the general ledger from the deposit and withdrawal registers, and from other books.

Shortly after Converse's appointment in 1871 he began the embezzlements which continued until his resignation, nearly forty years later. Generally speaking, the method employed by him to conceal his embezzlements consisted in either falsifying the footings upon the deposit register so that the footings indicated

a less amount, than had been in fact received and credited, or by omitting to make entries on the deposit register of amounts actually received. In order to make the other books agree with the falsified deposit register, Converse falsified the entries of total deposits in the general ledger and entered the total withdrawals for the various months in sums larger than the actual withdrawals as indicated by the withdrawal register, and further made false entries of the cash received and paid out in the cash account of the general ledger. During all this time the individual depositors' accounts in the depositors' ledger were correctly kept, and in all instances correctly showed the deposits actually received from, and the withdrawals actually made by, each depositor, and also correctly showed the balance, if any, due each depositor at any given time. The total balances due depositors were not footed on the individual depositors' ledger, and the result of this system of falsifying the books was that the total liabilities of the bank to its depositors, as appearing in the deposit and withdrawal registers and carried from them into the general ledger, were greatly understated, but the same were properly and correctly stated in detail, though not in gross, in the depositors' ledger.

The finding of the court is that these embezzlements and falsifications would have been discovered at any time by a reasonably careful audit of the books of the bank, or by any reasonably careful comparison of the depositors' ledger with the deposit and withdrawal ledgers.

The by-laws of the bank prior to 1874 required the annual appointment by the directors of two auditors, who were to audit the treasurer's accounts quarterly and make written reports of the result. In 1874 this section of the by-laws was amended so as to require semiannual audits. In 1877 the General Assembly

passed a statute, now § 3447 of the Revision of 1902, requiring the directors, managers, or trustees of every savings-bank to annually appoint two or more auditors, not directors, managers, or trustees thereof, who should examine the books, accounts, and securities belonging to such bank, and make a sworn statement, showing the true condition thereof on the first day of October in each year. The directors complied with the by-laws of the bank and the statute, and appointed annually two competent auditors, who went through the form of auditing the books of the bank at least twice in each year, and sometimes oftener, and reported to the directors the results of their examination. The report made as of October 1st in each year was upon a printed form prescribed by the bank commissioners of the State. None of these reports purported on its face to exhibit a comparison of the liabilities to depositors as shown by the deposit and withdrawal registers, or by the general ledger, with the liabilities to depositors as shown by the depositors' ledger, and none was in form a trial balance of the kind hereinafter referred to. The bank commissioners of the State of Connecticut also examined this bank semiannually for thirty-nine years, in accordance with § 3457 of the General Statutes, and their published reports of it showed the condition of the bank to be the same as that shown in the statements of the treasurer and auditors to the directors.

The finding of the court is that reasonable care on the part of the auditors required that they should make a reasonable effort to compare a substantial number of items entered in the individual ledgers with corresponding entries in the registers at least once in two years; that no such effort was ever made by the auditors during the entire history of the bank; that no reasonably careful audit of the books of the bank was ever made by any person prior to January, 1912, and no attempt to

compare the net amount due depositors as indicated by the depositors' ledger with the net amount due depositors as indicated by the deposit and withdrawal ledgers. It is also found that the embezzelments and falsifications of Converse could have been discovered at any time by such an audit or by such a comparison.

From time to time the directors required Converse to furnish them statements of the condition of the bank and its earnings, to be considered by them for the purpose of determining whether dividends had been earned. Such statements were furnished by Converse, and showed that dividends had been earned, but they were in fact untrue statements, taken from the false balances in the general ledger. Believing these statements to correctly state the condition of the bank and its earnings, and relying upon their knowledge of the bank as derived from the reports of the auditors and bank commissioners, the directors declared dividends semiannually from 1872 to 1912, excepting the semi-annual dividend for July, 1878, which was omitted. In declaring these dividends the directors supposed that their total amounts would be calculated upon the false and grossly understated amounts of deposits as reported to them by the treasurer. In point of fact the dividends at the rate per cent voted by the directors were paid out by Converse upon the actual amounts due depositors, and for that reason were very much larger in amount than the directors supposed, and larger in amount than the earnings of the bank as reported to the directors by the treasurer, and in every instance except thirteen the semiannual dividends as actually credited to depositors were in excess of the net income actually earned by the bank during the six months last preceding, less one eighth of one per cent of its deposits, and as to such excess were illegally declared and paid. None of the directors, either individually or as a com-

mittee appointed for that purpose, ever made any examination of the treasurer's books. They made no inquiry of the auditors as to the character of their audit, and gave no instruction to the auditors as to the nature, character or detail of the audit which they were employed to make. No trial balance of the depositors' ledgers, or comparison of the deposits as stated in the general ledger with the deposits as stated in the depositors' ledger, was ever presented to or required by the directors. Beyond inquiring of Converse from time to time as to the condition of the bank and its affairs, the directors appear to have relied upon the reports made by the treasurer and the reports of the auditors and the reports of the bank commissioners, and to have made no other attempt to supervise the treasurer's conduct of his office.

The directors themselves were representative men of Windsor Locks, interested in its welfare, animated by a sense of public spirit, and served without compensation. All of them, with one or two exceptions, were substantial depositors throughout the existence of the bank and at the time of its failure. They were diligent in attendance at directors' meetings, which were frequently called, and met often informally to discuss the business of the bank. At these meetings they discussed the investments of the bank and passed on all purchases of bonds and securities, and in these matters acted with such diligence and prudence that the investments of the bank were at all times of a high order and the mortgages such that none were ever foreclosed. At these meetings they had before them and discussed carefully the reports of the auditors and of the bank commissioners of the State and of the treasurer, and in addition they inquired from time to time of Converse as to the condition of the bank. On several occasions different bank commissioners told several of the defendants, at

the time of making their stated examinations, that the bank was in fine shape, that it was a nice little bank, and all right; and these remarks were repeated and discussed at directors' meetings.

On the other hand, the surplus of the bank never accumulated, on Converse's own story, to an amount equal to three per cent of its deposits.

It is found that "the defendants believed that Converse kept his books correctly and proved his balances; they believed that the auditors examined the books of the bank with care and proved from a thorough examination of its books the different items shown on the statement rendered to them; they believed that the bank commissioners examined the bank thoroughly, and verified their statement of its liabilities by a thorough examination of its books; in reliance upon the statements of the treasurer, the auditors, and the condition of the bank as found by the bank commissioners, they believed that all dividends declared were earned; and they never had any reason to suspect the honesty of Converse or to doubt but what the auditors were making a thoroughly proved report of the bank's condition."

The last paragraph of the finding is as follows (Paragraph 108): "The defendants in the above entitled actions complied with the statutes of the State and observed the by-laws of the bank. They exercised in the performance of their duties reasonable care, good faith and ordinary prudence; they supervised and directed the affairs of the bank with that care and diligence that ordinarily prudent men would exercise under like circumstances; and they were not negligent as alleged in the complaints in said actions."

*Ralph O. Wells* and *Stewart N. Dunning,* for the appellants (plaintiffs).

*William Waldo Hyde* and *Edward M. Day*, for the appellees (defendants).

BEACH, J.   Before taking up the merits of the appeal, there are some preliminary matters which may be briefly disposed of.   The plaintiffs claim not only to recover from the defendants as directors, on the ground of neglect of duties as such directors, the amounts embezzled by Converse and the amount of dividends paid out in excess of net profits during his term of office, but they also claim, in case No. 534, to recover from the defendant Cleveland, in his capacity as treasurer, the amounts of dividends paid out in excess of net profits during Cleveland's term of office.   We do not think the complaint is adapted to that end, and this claim may be dismissed from the case on that ground without further discussion.

It is also claimed that § 3453 of the General Statutes which makes the directors, managers, and trustees of any savings-bank, "assenting" to a violation of any provision of statutory law relating to savings-banks, jointly and severally liable to such savings-bank for any loss which may result therefrom, imposes an absolute liability upon directors of savings-banks, and that the defendants are liable for losses occasioned by the payment of illegal dividends, whether they were negligent or not.   We think, however, there can be no assent, within the meaning of the statute, unless the directors had actual knowledge that the dividends declared were not earned, or unless they were negligent in not knowing the actual financial condition of the bank, in which case knowledge of the actual facts should be imputed to them for the purposes of this statute.

The cases, therefore, turn wholly upon the question of negligence, as affected by the defense of the statute of limitations.

The first question presented by this appeal is whether the finding of reasonable care, expressed in paragraph 108, is purely a finding of fact, in which case this record presents no appealable question; or whether it is a conclusion of fact and of law, in which case the record presents the question whether the proper standard of legal duty was applied to the case, and whether the conclusion of the court is logically deducible from the premises of fact set forth in the finding.

When a defendant is sued for negligence in his individual capacity as a private person, the question whether he has or has not exercised that degree of care which under all the circumstances might reasonably have been expected of an ordinarily prudent man, is, generally speaking, a question of fact. But these defendants are sued as bank directors, and the standard of reasonable care required by law of bank directors is affected by their fiduciary position, by the nature of the business, and by the fact that, in accepting the office, they hold themselves out as reasonably competent and reasonably qualified to perform the duties of the office. So that the issue in this case is not whether the defendants have conducted themselves as might reasonably be expected of ordinarily prudent men, but whether they have conducted the affairs of this bank as might reasonably be expected of ordinarily prudent bank directors. Moreover, a finding of reasonable care in the conduct and direction of the affairs of a bank for a period of forty years is more likely than not to be a conclusion based upon other findings of fact as to the nature of the defendants' conduct in several different lines of action; and it is evidently so in this case, for the findings of fact are not only numerous, but many of them sum up the whole course of the defendants' conduct with reference to some particular line of action or omission. The ultimate finding of reasonable care is

necessarily a conclusion founded on these intermediate generalizations, and, if logically inconsistent with them, may be reviewed in this court.

Bank directors, in their relation to the corporation, its creditors and depositors, occupy a fiduciary position. Many authorities regard them as trustees, others as not technically trustees, but all agree that by accepting the office they become obligated to exercise reasonable care and prudence in the discharge of their duties. In the view which we take of this case it is unnecessary to examine the numerous authorities upon the subject, for they are all agreed that such is the general rule.

The difference in the relation between a savings-bank and its depositors on the one hand, and an ordinary bank of discount and its depositors on the other, is well understood, and without going so far as to say that the directors of a savings-bank are trustees in any higher sense than those of other banks, it is, nevertheless, evident from the character of the institution, that the rule requiring of bank directors the exercise of reasonable care and diligence in the performance of their duties should not be relaxed at all in the case of savings-bank directors. Reasonable care in the performance of the duties of director of a savings-bank means the exercise of the same degree of care that ordinarily prudent directors of savings-banks would exercise under like circumstances. It seems clear that a due performance of the duty of reasonable care on the part of savings-bank directors involves at least a compliance with the statutes of the State, the by-laws of the corporation, and the usages of the business. Absolute uniformity of usage is not required, but in savings-banks, as in the conduct of other business, the omission to make use of an ordinary and approved precaution against the known risks of the business is, in the absence of any substitute for such omitted precaution,

prima facie evidence of a want of reasonable care. The directors were careful in selecting as treasurer a man who enjoyed, in a peculiar degree, the confidence of the community; they used care in the selection of competent auditors; they were diligent in attending directors' meetings; they were prudent and successful in investing the funds of the bank; and they were themselves honest, prudent and successful business men. Nevertheless, the fact that they fully discharged their duty as directors in these other respects does not release them from the discharge of the very important duty of reasonable oversight and supervision of the treasurer's conduct of his office. That such was their duty is well settled. In *Lowndes* v. *City National Bank*, 82 Conn. 8, 16, 72 Atl. 150, we said: "The law requires of directors the exercise of good faith and ordinary diligence and care in the performance of their duties. These duties include that of reasonable oversight and supervision. . . . Where there is a duty of finding out and knowing, negligent ignorance has the same effect in law as actual knowledge." And in that case we quoted, with approval, from *Martin* v. *Webb*, 110 U. S. 7, 15, 3 Sup. Ct. Rep. 428: "Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. . . . That which they ought, by proper diligence, to have known as to the general course of business in the bank, they must be presumed to have known."

Irrespective of authority, it would be clear that the whole duty of bank directors is not done without reasonable oversight and supervision of the mode in which the appointed custodians of its funds conduct their office. This duty of supervision is not performed by reposing confidence in such officers, however worthy of confidence they may seem to be. The history of the business, known to every bank director, shows that

confidence without supervision has often proved to be a temptation and an opportunity. We do not mean to say that directors are required to proceed on the theory that their officers are under suspicion, or to examine the books themselves, or to employ expert accountants specially commissioned to detect possible defalcations. Until something happens which is calculated to put reasonably prudent bank directors on inquiry, they are entitled to assume that their officers, if selected with reasonable care, are honest. Yet there is a proper field for oversight and supervision of books and accounts within these limits, and for the purposes of this case it is sufficient to say that bank directors are bound to see that an approved system of bookkeeping is adopted, which will tend to furnish some protection to the bank against mistakes and false entries; and that they are bound to exercise reasonable care in seeing that the bank gets the benefit of the protection which such a system of bookkeeping purports to give. No system of bookkeeping pretends automatically to prevent or detect embezzlement; but approved systems do provide opportunities for checks and comparisons which are adapted to discover honest mistakes, and which have some tendency to discourage dishonest impulses; and the duty of making a reasonable effort to see that the bank gets whatever measure of protection its system of bookkeeping purports to give is very plainly a part of the directors' duty of reasonable oversight and supervision. Otherwise there would be no object in requiring them to adopt an approved system.

In this case an approved system of double-entry bookkeeping was adopted which contemplated that a certain measure of protection would be afforded by comparing one set of entries with the other set, from time to time. Such comparisons involved the taking of so-called trial balances of the depositors' ledgers.

Yet, during the thirty-nine years over which Converse's stealings extended, the directors did not require that such trial balances should be taken, and none were taken; and by reason of that omission the bank was deprived of whatever measure of protection against mistake or dishonesty its double-entry system of book-keeping purported to give. The findings of the trial court on this point are as follows: "77. The embezzlements of said Converse would have been discovered at any time after 1879 by any competent bookkeeper or auditor taking a so-called trial balance of the depositors' ledger; that is, by totaling the balances due depositors as of any given date, as stated in the several individual accounts in the individual ledger, and comparing such total with the net amount due depositors as stated on the general ledger and on the daily balance books, or as appearing from the net difference between the gross deposits and the gross withdrawals as stated in the deposit and withdrawal registers. 78. It is customary in savings-banks in Connecticut to have a trial balance of this kind taken by their treasurers at periods varying from once in three months to once in two years. 79. No trial balance was ever taken of the depositors' ledger and the general ledger of the Windsor Locks Savings Bank until shortly prior to the appointment of the receivers. 80. About January, 1912, the existence of the shortage and defalcations was at once discovered by taking such a trial balance."

In this connection we are referred to other paragraphs of the finding, which read as follows: "98. The bank followed the usual method of conducting its business found in other banks in this State of a like kind, and in other banks in this State of the size of this one the treasurer keeps the books and proves his balances, and the directors rely for knowledge of its condition upon the statements of the treasurer, the reports of

the auditors appointed in accordance with section 3447 of the General Statutes, and upon the examinations and reports made by the bank commissioners. 99. It is not customary for directors of other banks to instruct their treasurer how to keep his books, nor to instruct the auditors appointed in accordance with law how to make their audit."

We see no inconsistency between the specific findings as to trial balances and the general findings as to conduct of the business of this bank, or the customs of directors of other banks. Taking these findings as a whole, the important difference between other banks and this bank was that in other banks it was customary to require the treasurer to take trial balances of the depositor's ledgers from time to time, and in this bank not.

It does not appear how long this custom of requiring such trial balances has existed, but the fact that it is found as a custom shows that it has been a general practice for a period long enough to make it a material fact in this case; that is to say, long enough for the defendants to have known of it, if they had been reasonably diligent in informing themselves of their duties as directors of a savings-bank. Otherwise the finding would have been qualified by some limitation of time or lack of opportunity for knowledge on the defendants' part.

That the custom itself is reasonable goes without saying. Indeed, it is not only reasonable, but a necessary incident of such a mode of bookkeeping, that a financial institution, which keeps its statements of liabilities in two different forms, should make some effort, from time to time, to see if the two statements agree. This much seems to have been taken for granted at the trial, for the court has found, as if in mitigation of the failure to require such trial balances to be taken,

that the defendants believed that Converse proved his balances, and believed that the auditors thoroughly examined the books, and believed that the bank commissioners verified their statement of liabilities by a thorough examination. Upon what ground these beliefs rested is not found, unless upon the reports of the treasurer, auditors and bank commissioners, none of which purported to be or to embody such a trial balance. The fact remains that the directors never asked for or saw such a trial balance during their entire period of service, although it was customary in savings-banks in Connecticut to have such trial balances taken by the treasurer from time to time, and although it was a reasonable and a necessary incident of their system of bookkeeping that such trial balances should be taken from time to time for the protection of the bank. This, we think, was an omission which constituted want of reasonable care, unless some other precaution was adopted in its place.

It is said that the reports of the auditors and bank commissioners were a sufficient substitute; but, as already stated, they are not, in form or in substance, trial balances. Then it is said that the directors had a right to believe from the reports of the auditors that the statement of liabilities in the general ledger had been compared with the statement of liabilities in the despositors' ledger. But the finding is, in this regard, that none of the defendants at any time made any inquiries of the auditors as to the character of their audit or the amount of time occupied, or the method employed, or gave them any instructions; but that the only directions or instructions given to the auditors were given by Converse, and that all the reports of auditors—with two possible exceptions—were entirely in the handwriting of Converse, except the signatures of the auditors appended thereto. Upon this finding,

nothing remains to justify the directors' belief that trial balances of the depositors' ledgers had actually been made, except the auditors' reports themselves.

It is not necessary in this case to determine whether the directors, having failed to require the treasurer to take such trial balances, were in duty bound to direct the auditors to do so. We refer to these findings simply to point out that the failure of the directors to give directions to or make inquiries of the auditors, leaves their mistaken belief that the auditors actually made such trial balances or comparisons without any foundation, except such as may be found in the reports themselves and in the inferences to be drawn from their examination.

These reports were in two forms: first, a certificate annexed to the treasurer's summary of assets and liabilities, as follows: "This certifies that we have this day examined the books and vouchers of the Windsor Locks Savings Bank, and found this above statement . . . correct." The reports in this form are, on their face, merely verifications from the books of the treasurer's figures of assets and liabilities. They import no examination of the books, except to see that the figures in the treasurer's statement agree with those appearing on the face of the books, and do not purport to be an audit or examination to see whether the books were correctly kept, or whether they agreed among themselves. The other form of auditors' report was on the blank prescribed by the bank commissioners, and reads as follows: "We, the undersigned, not being directors, managers, or trustees of the Windsor Locks Savings Bank, having been appointed by the directors of said bank auditors to examine its books, accounts and securities, do hereby certify that we have made the examination required by Section 3447, General Statutes of Connecticut, and find that the condition

of said bank on the 1st day of October, 19—, was as follows, viz.:" Then follows a statement, the words and figures all in Converse's handwriting, as the defendants knew, and evidently, therefore, prepared by Converse in advance of the audit.

We doubt whether an audit of this kind is a compliance with § 3447, which plainly contemplates that the auditors shall find out for themselves, by an independent examination of the books, what is the condition of the bank. But however that may be, it is clear enough that these reports are not, and do not purport to be, based upon trial balances of the depositors' ledgers. To any one who knew that they were in the handwriting of the treasurer, they would fairly indicate that the auditors had verified the treasurer's statement of the amount of the deposits, and had examined the books and accounts for that bank for that purpose; which would not necessarily or reasonably involve anything more than an inspection of the figures in the deposit and withdrawal registers and of the total deposits as stated in the general ledger, and daily balance books, these being the only books which contain any statement of the total deposits. In short, all these auditors' reports are, on their face, directed to the single purpose of ascertaining the assets and liabilities of the bank as shown on its books, and not to the purpose of ascertaining whether the statement of liabilities to depositors as shown in detail by the depositors' ledgers agrees with the statement of total deposits as shown on the other books. That such was the common understanding in banking circles is shown by the survival of the custom of having the treasurer take trial balances of the depositors' ledgers from time to time.

All other savings-bank were required by statute to have their books and accounts examined by auditors

annually, and the form of the audit prescribed by the
bank commissioners was presumably uniform for all
savings-banks; yet other boards of savings-bank direc-
tors continued. to require their treasurers to take trial
balances from time to time, and did not regard the
statutory audit as a substitute for such trial balances.
In 1913 the legislature amended § 3447 by adding these
words: "Such auditors shall cause to be exhibited the
last trial balance of depositors' ledgers, verifying the
same with the controlling account in the general ledger,
and immediately report any variance to the bank
commissioners." Public Acts of 1913, Chap. 187,
§ 6 (p. 1804). The statute as amended still requires
the auditors to examine the books and make a sworn
statement of the true condition of the bank, and the
amendment does not require the auditors to take a
trial balance of the depositors' ledgers. It assumes
that such a trial balance has already been taken by
the officers of the bank, and requires the last trial
balance to be exhibited to the auditors. From the
form of the reports, the usage of the business, and the
amended statute, it is apparent that both bankers and
legislators have always assumed that the statutory
audit did not involve the taking of a trial balance of
the depositors' ledgers. And if these defendants, ig-
norantly and without asking any questions, believed
that their auditors did take such trial balances, we
think they were not, on the facts found, reasonably
justified in that belief. The same considerations apply
to the reports of the bank commissioners, and to the
finding that the defendants believed that the bank
commissioners verified their statements of the bank's
liabilities by a thorough examination of its books;
and also to the finding that the defendants believed
that Converse had balanced all his books. Being ob-
ligated to exercise reasonable care and prudence in

the discharge of the duty of general supervision of the affairs of the bank, the defendants were not, on the facts found, warranted in dispensing with any actual supervision over the methods of bookkeeping; and in assuming, without asking any questions, that trial balances of the depositors' ledgers were taken.

We cannot assent to the argument that the State, by § 3447, has undertaken to give directors of savings-banks instructions how to supervise the treasurer's accounts, and that the directors have fully complied with their duty in this regard by appointing competent auditors, and then leaving the whole supervision of the treasurer's accounts to such auditors and to the bank commissioners. The duty of supervision rests ultimately on the directors, and, on this finding, that duty was not fully discharged by believing, without inquiry, and without reasonable justification from the form of their reports, that the treasurer and auditors and bank commissioners had taken trial balances of the depositors' ledgers.

The defendants' argument assumes, and wrongly so, that the statutory audit is in lieu of the common-law duty of the directors. For reasons which are manifest, the legislature did not, and did not intend to, shift the whole responsibility for supervision of the books and accounts from the board of directors and put it upon auditors appointed annually for a special purpose, and having no connection whatever with the bank except for a few hours in each year.

Our conclusion is that the specific findings of the court with reference to the omission to require trial balances of the depositors' ledgers from time to time, according to custom, are, under the other circumstances disclosed by the specific findings, inconsistent with the conclusion of the trial court as expressed in paragraph 108, that the defendants have performed the duties of

their office with reasonable care and ordinary prudence, and that they supervised and directed the affairs of the bank with that care and diligence that ordinarily prudent men would exercise under like circumstances.

The question then arises, whether the defendants' neglect of their duty of supervision, of which the failure to require trial balances of the depositors' ledgers from time to time is the most prominent feature, can be regarded as the proximate cause of the loss, in view of the fact that the trial court has included in its finding a statement to the effect that such trial balances, taken by a dishonest treasurer, would not have disclosed the actual condition of the books. The argument that the defendants ought not to be held liable for the omission to require trial balances, because trial balances made by a dishonest treasurer would amount to nothing, cannot be pushed very far without practically nullifying the rule laid down in *Lowndes* v. *City National Bank*, 82 Conn. 8, 72 Atl. 150, that the law requires of directors the duty of reasonable oversight and supervision; for such an argument leads ultimately to the conclusion that if the person or persons in charge of the books are dishonest, all ordinary methods of supervision by directors become useless, and may therefore be dispensed with. To say that the taking of trial balances of the depositors' ledgers by the treasurer of a bank is a useless precaution because he may falsify the trial balances as readily as he may falsify the books, is to contradict the best opinion of those experienced in the banking business, as indicated by their custom of requiring such trial balances to be taken. We cannot say that the taking of such trial balances in this case by Converse would necessarily have resulted in a discovery of his stealings. Yet we can say that the knowledge that such trial balances would not be asked for made the chance of discovery seem more remote. It cannot

be assumed that Converse was a predestined criminal. It is quite as reasonable to suppose that he yielded to temptation and continued his stealings because it was made easy for him to do so without fear of detection. The history of most defaulting bank officials is that they feel compelled to keep the depositors' ledgers in balance with the other books by a system of false debits on individual accounts; a system which in the case of savings-banks presents peculiar difficulties, in view of the necessity of semiannual calculations of interest on depositors' balances.  Converse, however, had no apprehension that a trial balance of the depositors' ledgers would be asked for, or that a false trial balance, which would have been on record, if it had been asked for, might be audited by third persons. He did not feel it necessary to falsify depositors' accounts in detail.  He followed the easier path left open by the neglect to require any trial balances; and the system, or lack of system, under cover of which he successfully began and continued his course of embezzlement, was the natural result of such neglect.  What would have happened if the directors had, unexpectedly to Converse, asked for a trial balance of the depositors' ledgers, we cannot say.  It is not possible, in such cases as this, to demonstrate the causal relation between neglect and injury as clearly as if the problem was one of mechanics.  But it is certain that, unless we are to abandon the salutary doctrine of *Lowndes* v. *City National Bank*, 82 Conn. 8, 72 Atl. 150, these bank directors must be held responsible for a neglect to take an approved precaution against the known risks of the business, which obviously made it easier for Converse to continue and to cover up his embezzlements in the particular manner which he chose to adopt for that purpose.  Such negligence, so related to the loss, being apparent on the findings, we do not think it is a good

defense to conjecture that Converse would have stolen just as much even if the directors had not been negligent.

On the whole case, we are of opinion that the trial court has failed to apply the proper standard of legal duty to the defendants' conduct in this case; that the reasonable care which the law requires of savings-bank directors is that degree of care which might be expected of reasonably prudent directors, having regard to the reasonable usages of the business, as well as to the statutes, and to the charter and by-laws of the corporation; that the custom of requiring the treasurers of savings-banks to take trial balances of depositors' ledgers from time to time, as found by the trial court, is a reasonable usage of the business; and that the failure to require such trial balances was, under the circumstances of this case, a proximate cause of the loss, and of the illegal declaration of dividends.

The defendants plead the statute of limitations as to all damages claimed in Nos. 536 and 537, and also as to so much of the damages claimed in No. 535 as accrued more than six years next before the appointment of the receivers; and the plaintiffs reply alleges that each of the defendants continued in office until within six years before the appointment of the receivers, and that by voting assent to the declaration and payment of unearned dividends, and by permitting the publication of false reports to the bank commissioners, and otherwise representing the bank to be solvent, the defendants fraudulently concealed from the depositors the causes of action set forth in the complaints.

The most important claim of the plaintiffs is that savings-bank directors are trustees in whose favor the statute of limitations will not run so long as they hold office. This question was not briefed or argued at the first hearing, but it has now been fully discussed before

us on reargument granted for that purpose. The general rule, as quoted with approval in *Cone* v. *Dunham*, 59 Conn. 145, 158, 20 Atl. 311, is as follows: "To exempt a trust from the bar of the statute of limitations it must, first, be a direct trust; second, it must be of the kind belonging exclusively to the jurisdiction of a court of equity; and third, the question must arise between trustee and the *cestui que trust.*" *Haywood* v. *Gunn*, 82 Ill. 385. These cases do not meet the above requirements. Bank directors are not technical trustees any more than are the directors of other corporations; yet nobody doubts that corporate directors, including bank directors, may, under certain circumstances, make themselves liable for corporate assets as if they were trustees. But the question which we have to answer is a much narrower one, namely, whether these defendants ought to be treated as if they were trustees of a direct or express trust, or whether they ought to be treated as if they were trustees of an implied trust. In the former case the statute will not run, and in the latter it will.

It seems to us that in such cases a distinction should be drawn, dependent upon the character of the alleged breach of duty. If a fiduciary embezzles the funds in his hands, we call it a breach of trust, whether it be technically such or not. But if he neglects to deposit the funds in a bank and they are consequently stolen from his residence, we call it negligence, although such negligence is a breach of duty arising from a fiduciary relation. A similar distinction will be found in the cases against bank directors. If, as in *Williams* v. *McKay*, 40 N. J. Eq. 189, the directors are charged with ruining the bank through a persistent course of loaning money in direct violation of the express terms of the charter, under such circumstances that all of the defendants are chargeable with a systematic violation of

the charter by making *ultra vires* loans, then, whether one agrees with it or not, it is easy to understand the process of reasoning which results in the conclusion that, upon a plea of the statute of limitations, they ought to be treated as if they had violated the terms of an express trust. That, however, is not the case we are called upon to decide. In these cases the directors have complied with the charter and by-laws and with the statutes, and their only breach of duty is the failure to exercise reasonable care in the supervision of the conduct of a dishonest treasurer, of whose dishonesty they had no notice. It seems more reasonable to hold that such a breach of duty, if it be a breach of trust at all, is comparable rather to a breach of an implied trust than to a breach of an express or direct trust, as the latter is defined in *Cone* v. *Dunham*, 59 Conn. 145, 158, 20 Atl. 311. Without attempting to exhaust the comparison, two points are referred to: first, that the duty of exercising reasonable care in supervising the conduct of the treasurer is a duty which is imposed on the directors by law as a consequence of their acceptance of the office, and is not an obligation created or imposed by the terms of a written instrument; second, that it is one of the characteristics of a direct or express trust, and one of the most persuasive reasons for exempting such trusts from the bar of the statute, that they are not terminable at the will of the *cestui que trust*, whereas one of the distinguishing characteristics of an implied trust is the right of the beneficiary to a conveyance of the legal title on demand. In both of these particulars the special relation here in controversy between the defendants and the depositors resembles an implied trust rather than an express trust.

It is not necessary to the decision of this case to determine whether directors of a savings-bank ought to be called trustees, mandataries, or agents, in their

relation to creditors and depositors. Giving full consideration to the undoubted fiduciary character of that relation, and regardless of any technicalities, the fact remains that the only breach of duty which is here alleged and proved is one which is more analogous to the breach of an implied trust than to the breach of a direct or express trust. Our conclusion seems to be in accord with the general course of decisions on this point, and we will refer for illustration only to the comparatively few cases in which the precise point of the applicability of the statute of limitations to suits against bank directors for the recovery of corporate assets has been determined. *Wallace* v. *Lincoln Savings Bank*, 89 Tenn. 630, 15 S. W. 448, and *Stone* v. *Rottman*, 183 Mo. 552, 82 S. W. 76, were actions founded, as these are, solely on the negligence of the directors in not discovering or preventing the loss of corporate assets caused by the wrongful conduct of a president or cashier; and it was held in both cases that the statute did not apply. We have not been referred to any suit for the recovery of corporate assets in which bank directors charged only with passive negligence, not amounting to actual or constructive participation in the wrongful acts which were the original cause of the loss, have been treated, on a plea of the statute of limitations, as trustees of an express trust. In all of the cases in which the statute has been held not to apply to bank directors, the defendants have either participated in a positive violation of the express terms of the charter, by-laws, or statutes, or they have had notice of such violation by others and have taken no steps to prevent its continuance. In *Williams* v. *Mc-Kay*, 40 N. J. Eq. 189, the losses resulted from a long and systematic course of loaning money on personal security merely, in violation of an express provision of the charter, and from the president drawing personal

checks on the bank.  The by-laws provided for reports of the executive committee (who made the loans and whose duty it was to examine the books) to the board; and the court, on demurrer, held that on the allegations of the complaint, all of the directors were chargeable with knowledge of the systematic doing of the illegal acts.   In *Rankin* v. *Cooper*, 149 Fed. Rep. 1010, the bank was wrecked by long-continued and renewed loans to the president and others in violation of the terms of the federal statutes relating to national banks; and in that case each director had personal notice from the comptroller of the treasury of the existence of those loans and of their illegal character, yet they did nothing to collect them or prevent their renewal and increase. In *Greenfield Savings Bank* v. *Abercrombie*, 211 Mass. 252, 97 N. E. 897, and *National Bank of Commerce* v. *Wade*, 84 Fed. Rep. 10, the loss was caused by loans made in direct violation of the statutes, and only those directors and officers who participated in making the loans were made defendants.   Upon principle and authority we think that the defendants' breach of duty in these cases cannot be treated as a breach of an express or direct trust.

In view of this conclusion, it is unnecessary to determine whether these actions are, within the rule laid down in *Cone* v. *Dunham*, 59 Conn. 145, 158, 20 Atl. 311, exclusively cognizable in equity, or whether they are between the trustee and *cestui que trust*.   We prefer to rest our decision on the broader ground that the defendants are not guilty of anything more than passive neglect of the duty of exercising reasonable care in the supervision of the treasurer, without actual or constructive notice of any wrongdoing on the treasurer's part.   Their offense is not so heinous as to require that they should be deprived, by a court of equity, of their statutory defense.   Both reason and authority in-

dicate that the exercise of such an extreme judicial power may well be reserved for a different case.

These considerations dispose, also, of the claim that the directors are equitably estopped, by the declaration of dividends and by the published annual reports of the condition of the bank, from asserting the defense of the statute of limitations. It is the bank's cause of action which is sued upon, and the bank which is the beneficial claimant; and the depositors, in whose favor the alleged estoppel is claimed, have no right of action against the directors. But if we should assume that the receivers might, in a proper case, assert an equitable estoppel in favor of the depositors as against the defense of the statute of limitations, this is not such a case. This court has questioned whether "a party in a court of law can be prohibited, on the score of equitable estoppel, from defending himself under a public statute, designed to be of universal operation in the matter of legal remedies." *Bank of Hartford County v. Waterman*, 26 Conn. 324, 330. At least it is manifest that the courts cannot nullify the statute in every case in which they think it is inequitable to apply it, and the cases in which such an estoppel has prevailed over the statute have generally been limited, as we think they ought to be, to cases in which the defendant's conduct or representations were directed to the very point of obtaining the delay of which he afterward seeks to take advantage by pleading the statute. See 25 Cyc. 1016, and cases collected in the notes. In the cases at bar there is nothing to indicate that the declarations of dividends and the filing of the reports required by statute with the bank commissioners were intended to prevent the depositors from withdrawing their balances, and there is no finding that the depositors were thereby induced to refrain from doing so. We think the essential elements of an

equitable estoppel sufficient to overcome the statute are entirely lacking in these cases.

The claim that the statute is suspended because the cause of action was fraudulently concealed, apparently rests on the erroneous theory that these actions are in effect suits on behalf of the depositors; that the directors were negligent in not knowing the true condition of the bank, and therefore they are to be treated in law as if they knew that the bank was insolvent, and still continued to declare dividends and permit the publication of false reports of its financial condition. On the contrary, these actions are on behalf of the bank, to recover for the consequences of negligent acts or omissions on the part of the whole board of directors, acting as such, which acts or omissions were necessarily known to the bank at the time they were done or omitted. The bank did not know, and neither did the defendants know, what were the consequences of such negligent acts or omissions, but the causes of action arose from the neglect and not from the consequences, although the measure of recoverable damages depends upon the latter. There has been no concealment, actual or constructive, by the defendants of any fact or cause of action, much less any fraudulent concealment.

Neither can we disregard the artificial entity of the corporation and treat the directors as if they held the legal title to the funds of the bank. The legislature has, by special charter, authorized this and many other savings-banks to be conducted as corporations without giving the depositors any membership in the corporation, or voice in the selection of its officers or in the management of its affairs. Such being the policy of the State, its courts cannot disregard the corporate character of this institution so long as the directors conduct its business in accordance with the charter.

The defense of the statute of limitations is upheld as

to all losses incurred and illegal dividends paid more than six years before the time of serving the citation on the Windsor Locks Savings Bank for the appointment of receivers, to wit, February 6th, 1912. General Statutes, § 3471.

In Nos. 536 and 537 there is no error. In Nos. 534 and 535 there is error and new trials are ordered.

THAYER, J., concurred in the result and in the opinion.

WHEELER, J., concurred in the opinion, except as to that portion of it which treats of the statute of limitations and its effect upon cases 535, 536 and 537, and as to this and the effect of it upon these cases he dissented.

PRENTICE, C. J., and RORABACK, J., dissented from the opinion, except that portion of it which deals with the operation of the statute of limitations, and from the result in cases 534 and 535; they concurred in the result in cases 536 and 537.

WHEELER, J. I concur in the majority opinion except as to that portion which treats of the statute of limitations and its effect upon cases 535, 536 and 537, and as to this and the effect of it upon these cases I dissent.

These cases are all actions to recover from the directors of a savings-bank losses to the bank through the negligence of the directors. They are quite similar, differing merely as to the period of time covered.

The majority opinion holds that the directors were negligent, but that in cases 536 and 537 the actions are barred, and as to 535 partially barred, by the statute of limitations, since the alleged losses were incurred and the illegal dividends paid more than six years next before the commencement of these actions.

This particular question was not argued or briefed until the reargument.

1. The judgment rendered was based upon the issues raised by the first defense, which did not include the statute of limitations. The appeal was taken from this judgment. Moreover, the trial court decided the issue with respect to the statute of limitations in favor of the plaintiffs, and we are considering only the plaintiffs' appeal. That issue is not, in my opinion, properly before the court on this appeal. But since my brethren discuss and decide the point, and as it is of far-reaching consequence and, in my opinion, the most important feature of this case, I will state my views upon it.

It should be noted, in the first place, that these actions are not by the bank, but by the receivers of an insolvent savings-bank, and they represent, primarily, creditors and depositors who in reality are the beneficial owners of the funds of the bank, and, secondarily, of the corporate body. The bank could only know of the negligence of these directors through its negligent officers, and they themselves did not know of the defalcations until after the failure of the bank. The depositors did not know, nor did the creditors, and neither could have known by the exercise of reasonable diligence.

My associates hold that depositors and creditors who did not know of the defalcations, or of the dividends wrongly paid, or of the negligence of the directors, and had no reasonable means of knowing, are barred from pursuing, through the receivers, their just causes of action, because the losses were incurred more than six years prior to the commencement of these actions. They have never had an opportunity when they possessed, or should have possessed, the knowledge which would have enabled them to protect their legal rights. Never, heretofore, have they had their day in court.

2. The claim against these directors is an asset of the bank, and depositors and creditors are the beneficial owners of it. *Price* v. *Society for Savings*, 64 Conn. 362, 367, 30 Atl. 139. Neither bank, depositors, nor creditors have ever had the chance to collect this asset. The directors' negligence caused the losses and concealed them from the parties in interest. Shall the directors be permitted to wrong depositors, creditors and the bank, and escape liability by reliance upon their own negligence? Doctrine which leads to such a result does not seem to me to be sound.

"The statute of limitations assumes the existence of a cause of action and also of what, were it not for the statutory prohibition, would be a right of action." *Schempp* v. *Beardsley*, 83 Conn. 34, 37, 75 Atl. 141. But "it is because of the laches of the creditor in failing to pursue his remedy that the statute deprives him of the right to pursue it after a prescribed time." *Hull* v. *Thoms*, 82 Conn. 647, 652, 74 Atl. 925. "The question [statute of limitations] is one of laches, and that the appellants are not chargeable with any results necessarily from the fact that their father concealed the agreement from them, so that it first came to their knowledge after his death." *Fisk's Appeal*, 81 Conn. 433, 442, 71 Atl. 559. Upon the principle of these cases the statute is not available as a defense to these directors.

3. We have held that a savings-bank is a large incorporated agency for receiving and loaning money on account of its owners who are its depositors. *Coite* v. *Society for Savings*, 32 Conn. 173, 191; *Price* v. *Society for Savings*, 64 Conn. 362, 366, 30 Atl. 139. Some authorities regard the trustees or directors of a savings-bank as either express or implied trustees of the depositors, others as agents of the depositors, but there is a general agreement that the relation is a

fiduciary one. Let us assume the narrowest relation, that the directors or trustees are fiduciary agents of the depositors, and see what results in law follow. When an agent is entrusted with the care and investment of funds, and losses result to the funds through his negligence, and the beneficiary has no knowledge of the loss or of the negligence until a period more than six years thereafter, when the agency is terminated, can the agent defend against a recovery by the principal by the plea that his principal is barred of his recovery, since the losses occurred more than six years prior to the demand? I take it to be sound law that the agent cannot plead the statute against his principal until the termination of the agency, or knowledge brought home to the principal of the agent's delict. Any other rule would jeopardize the principal's interest, without fault on his part, in favor of the agent whose dereliction of duty caused the loss. The agent may not plead his own neglect in bar of his principal's right of recovery. 1 Mechem on Agency (2d Ed.) § 1347, states the rule: "The purpose of the statute of limitations in these cases is to protect the agent against the assertion of stale claims, but it ought not to be made the means of screening a guilty agent, by allowing him to set it up as a defense, when the agent's own fault furnishes the cause of action, and the principal had no knowledge or means of knowledge that such a default had occurred." *Cooper* v. *Hill*, 36 C. C. A. 402, 407, 94 Fed. Rep. 582, 587. In case of ordinary agency, the statute does not run until the agency is terminated. *In re Sharpe*, L. R. (1892) 1 Ch. Div. 154; 1 Clark & Skyles on Agency, § 425, p. 948.

In *King* v. *Mackellar*, 109 N. Y. 215, 16 N. E. 201, the plaintiff entrusted to defendant $3,000 to invest for her. This he did not do. The court (p. 224) recites the provision of the New York Code, that "where

the right grows out of the receipt or detention of money, . . . the time must be computed from the time when the person having the right to make the demand has actual knowledge of the facts upon which the right depends," and says: "This section was a codification of the law as it existed at the time of its adoption and created no new rule of law." In a case where a judgment had been obtained against A without notice, and the time limited for a petition for a new trial had expired, we said: If he, A, has full knowledge of the existence of the judgment the statute of limitations would run from the time of knowledge. If he has no knowledge and was not in fault, a court of equity will entertain his case within a reasonable time after the matter has come to his knowledge. *Jeffrey* v. *Fitch*, 46 Conn. 601.

This rule is one of clear justice, and prevents the statute running in favor of the negligent directors, even though they are in law mere agents of the depositors.

4. Let us now consider whether the directors did not stand in relation to the depositors as trustees. Savings-banks are institutions incorporated by the State for the encouragement of thrift among the owners of moderate incomes in the community. The incorporators of this bank were self-perpetuating and appointed themselves directors, and the directors always constituted a large majority of the incorporators. The depositors had no part, and could have no part, in the management of the bank, or the selection of the incorporators, or directors. A bank of this character is organized for the benefit of its depositors and conducted by its directors without profit to the corporation or directors. The undertaking held out by the bank to every depositor is to receive and invest his deposit through its officers, in the exercise of their reasonable fidelity,

diligence and skill, and in the observance of legal re-
quirements, and to pay him its increment and to return
him his deposit on demand, less the expense of man-
agement and the maintenance of a surplus as limited
by law. The bank is conducted by its directors, and
their undertaking toward the depositors is identical
with that of the bank. The bank and its directors hold
themselves out to the depositors to the performance of
this duty. The depositor parts with his title to the
specific form of his deposit, and in its stead obtains an
equitable ownership in the funds of the bank propor-
tioned to his deposit. Our whole rigorous statutory
system for the government and regulation of savings-
banks is based upon the theory that the bank and its
directors or trustees are administering a trust. The
deposits in the bank constitute a trust fund for the
benefit of its owners, the depositors. The institution
was created by law to administer a trust. Its directors
are by its charter "sworn to a faithful discharge of their
duties." This indicates the *quasi*-public character of
the trust. Since the bank is managed by directors or
trustees, they, upon assumption of office, become the
administrators of a trust fund and necessarily, in
virtue of their office and duty, trustees in fact, and
each depositor comes into a trust relation with the
directors who administer the trust fund created by the
deposits. Out of this relation arises the right of the
depositor to have his deposit managed with reasonable
care and in accordance with the statutory require-
ments, and on the part of the director a correlative
obligation so to manage this trust fund.

In an action by a stockholder against directors for
wilful misconduct causing a loss in the assets of the
bank, we held: "It is its [the bank's] property which
has been misappropriated and lost, and the damages
to be recovered belong to it,—to be sure in trust for

billholders, depositors and creditors." *Allen* v. *Curtis*, 26 Conn. 456, 460.

In *Pratt* v. *Pratt, Read & Co.*, 33 Conn. 446, 455, we said of the ordinary corporation, that it and its directors were trustees for the stockholders, and might be called into equity to account or to be restrained from mismanagement. 1 Morse on Banks & Banking (4th Ed.) § 3, p. 10 says: "A savings bank is simply a trustee; all moneys received under the charter are trust moneys, and the depositors stand in the same relation to the bank as the stockholders of an ordinary bank." In *Mallory* v. *Mallory Wheeler Co.*, 61 Conn. 131, 138, 23 Atl. 708, we said of the ordinary corporation: "The relation between the directors of a corporation and the company itself is in most respects a fiduciary relation. While not trustees in a technical sense they are often called such in practice." In *Hun* v. *Cary*, 82 N. Y. 65, 70, the court said: "The relation existing between the corporation (a savings-bank) and its trustees is mainly that of principal and agent, and the relation between the trustees and the depositors is similar to that of trustee and *cestui que trust.*"

We have decided that funds held for the protection of the members of a beneficial society partake of the nature of trust funds. *Grand Lodge of Conn.* v. *Grand Lodge of Mass.*, 81 Conn. 189, 206, 70 Atl. 617. In *New Haven Trust Co.* v. *Doherty*, 75 Conn. 555, 559, 54 Atl. 209, in an action against two of the principal officers and directors of a life insurance corporation for their wilful and negligent conduct in making loans contrary to law, we said: "The duty of the defendants in respect to the loan was analogous to that of a trustee in respect to an investment of a trust fund in a manner unauthorized by the terms of the trust. . . . The money in charge of the defendants . . . was . . . held by the corporation under limitations of invest-

ment analogous to those imposed upon a trustee in the investment of trust funds."

The authorities, as a whole, concede that the relation between depositor and director is one of trust, and determine the relation to be either an express trust or an implied trust. 25 Cyc. 1163. They also hold that, against an express trust, the statute does not ordinarily run, while against an implied trust it does.

5. Conceding for the moment that the trust is an implied one, this fact would be of no consequence in this case. The trust was a continuing one created by the law, and re-established with each deposit, and recognized by every depositor when he made each deposit, and by every director when he received it. His continuance in office was a constant recognition of this relation. In *Corr's Appeal*, 62 Conn. 403, 408, 26 Atl. 478, we held that the statute runs against a resulting trust, but that the statute does not run in the case of a resulting trust which has at all times been acknowledged. When an attorney has the management of his client's estate for investment, the statute does not run, although the authorities which hold the relation between depositor and director an implied trust would hold that the relation between client and attorney was not an express trust. 25 Cyc. 1161. Is there any just ground for depriving the attorney of the defense of the statute and according it to the director?

6. The trust created by law between director and savings-bank depositor arises as soon as the deposit is made. The director, upon assuming office, undertakes the execution of a trust. The deposit is put in the keeping of the directors because they are known to be administering a trust. The law of trusts grows out of the fact that property is entrusted to the control of another. Such a trust has none of the qualities of an implied trust, which is one implied or inferred from the

transactions of the parties to carry out their presumed purpose or intention. This trust is created by law, and imposed upon the parties without their consent, but with their acquiescence, since each director must be presumed to know when he takes office, and each depositor when he makes his deposit, that deposits are entrusted to the care of the directors. If I hand one my money and say, "Invest it and account to me for it," a direct trust is created. The law speaks for the depositor when he makes his deposit and says to the bank and its directors, "Take my deposit, invest it according to law, return me its increase and, upon my demand, the deposit itself." And the law speaks for each director and says to the depositor, "We accept your deposit upon those terms." Would the transaction have been any more direct or express had it been committed to a writing and duly signed by the parties? An express trust may be created by the written or spoken words of the parties, and this is the more common method, or by the act of the parties; or it may be created by the law, upon parties entering into certain business relations with each other of the character of those between depositor and director of a savings-bank.

The right of the depositor in the funds of the bank gives him a right of action, through the receiver, against negligent directors for the loss of those funds, and such a right is that of a *cestui que trust* against his trustee. The leading case in this country upon this subject is *Williams* v. *McKay*, 40 N. J. Eq. 189. The action was one in equity by a receiver of a savings-bank against the managers of the bank, to recover for losses incurred through their negligence. The court, in an opinion by Beasley, C. J., held that the relation between the managers and depositors was that of trust, and that the trust was a direct one, created immediately upon the placing of the funds under the control of these

managers; and that the statute of limitations would not shield them from losses occurring through their neglect over a period within the statute.

In *Greenfield Savings Bank* v. *Abercrombie*, 211 Mass. 252, 97 N. E. 897, the investment committee of the trustees of a savings-bank made loans largely in excess of the statutory limits. The trustees were held liable for resultant losses. "But," says the court, "the defendants insist that the statute of limitations is a bar to any remedy for most of their wrongful acts. . . . But this contention overlooks the fact, which has been sufficiently shown, that these defendants stood as to the bank and its depositors in the position of trustees of a direct trust. In such a case the statute of limitations does not begin to run against the *cestuis que trust* until they have learned of the trustee's wrongdoing or of his practical repudiation of the trust and of the duties thereby imposed upon him."

Both of these cases are illuminating examples and expositions of the doctrine which I would apply to this case.

*Brinckerhoff* v. *Roosevelt*, 74 C. C. A. 498, 143 Fed. Rep. 478, was an action by a stockholder against the president of an incorporated building association to recover loss to the corporation through the negligence and mismanagement of the president. The court held (p. 500): "The action is not barred by the statute of limitations or for laches, for the reason that the complainant did not discover the wrongful conduct, which is the foundation of the action, until a few months prior to its commencement. Directors are assumed to act for the interests of their stockholders, and the latter have a right to rely upon the assumption that they are acting honestly until the contrary appears." *In re Liverpool Household Stores Asso.*, 59 L. J. (N. S.) Ch. Div. 616; *In re Sharpe*, L. R. (1892) 1 Ch. Div. 154;

*Ellis* v. *Ward,* 137 Ill. 509, 25 N. E. 530; *Zuck* v. *Culp,* 59 Cal. 142; *Williams* v. *Reilly,* 41 N. J. Eq. 137, 3 Atl. 692.

The majority opinion distinguishes some of these cases as being in violation of some positive duty imposed by statute, charter, or by-law. We see no difference between the failure to use reasonable care in meeting such a duty or in meeting the common-law duty to use reasonable care over these funds. Each is equally obligatory.

One feature of these cases may not be distinguished. They hold that the directors or trustees of a savings-bank are either trustees of a direct or express trust for the depositors, the *cestui que trust,* or under the same duties as the trustees of an express trust. The fact that the bare technical legal title is in the corporation is not permitted to prevent the creation of a direct trust. And it ought not in this case, where the incorporators are self-perpetuating and select the directors who have constituted always more than a majority of the incorporators.

7. All authorities hold that until a fraud could have been discovered by reasonable diligence, the statute does not begin to run against a *cestui que trust* of either an express or an implied trust. The cause of action begins from the date of the fraud, as it does from the date of the negligent act. The reason for the exception in the case of fraud is that the beneficiary did not have the opportunity to protect his rights until he had knowledge of the fraud. For a similar reason the action of the depositor, for a loss incurred through the negligence of the director or trustee, was not barred until knowledge of it came to him. An instance of the application of this exception is found in *Lewey* v. *Fricke Coke Co.,* 166 Pa. St. 536, 31 Atl. 261. There, in an action of trespass to recover damages for the unlawful mining of

coal under plaintiff's land, the equitable rule, that the statute of limitations runs only from discovery, or a time when discovery might have been made, was applied. The true rule is that the action lies from the time when the *cestui que trust* could, by the exercise of diligence, have enforced his rights by suit.

8. So long as the directors were in office, no suit could or would be brought to recover for the losses caused by their negligence; it was only after the appointment of the receivers that suit could be brought. Before that time the trust estate was in the control of these directors; the statute does not run during such period of control against a *cestui que trust* unacquainted with the loss. *Rankin* v. *Cooper*, 149 Fed. Rep. 1010, 1016; *National Bank of Commerce* v. *Wade*, 84 Fed. Rep. 10, 15, 16. The statute of limitations should not run in favor of fiduciaries having powers and duties of control and management and against a *cestui que trust*, so long as the fiduciary relationship continues and the *cestui que trust* has no notice of the violation of trust by the fiduciary.

9. In one of the two cases cited in support of the court's conclusion (*Stone* v. *Rottman*, 183 Mo. 552, 82 S. W. 76), the statute of limitations was not raised on the appeal.

10. The opinion holds, as I understand, that as to all losses incurred and illegal dividends paid more than six years next before the commencement of these actions, no action in equity would lie in these cases, since the defendant directors were not trustees of an express trust, and the plaintiffs have an adequate remedy at law. And it holds that the action at law is barred as to such losses and dividends unless there was a fraudulent concealment of the cause of action, and that none such appeared of record. So that in no possible action could these directors be found liable for the results of their

negligence preceding such six-year period. I have not been able to persuade myself that such a conclusion is either sound in law, or sensible in practice, or wholesome in its effects.

We hold, upon this record, that the negligence of these directors has caused a very large loss to the depositors of this bank who trusted to their fidelity and diligence. They had no means of knowing of the dishonesty of the treasurer. The directors had. The depositors were in ignorance of this. As soon as the directors were compelled to give up control of the depositors' funds to the receivers, this action was brought. The depositors were ignorant of the embezzlement, and could not have known of it by the exercise of reasonable care. The directors were ignorant of the embezzlement continuing through forty years, but if they had performed their duty as directors, they would have known of it. Who in justice should suffer? Must not the answer be, these negligent savings-bank directors, rather than these innocent depositors?

PRENTICE, C. J. (dissenting). I find myself unable to concur with the majority of the court in their conclusion that the court below committed legal error in finding, as it did, that these defendant directors, in the performance of their duties as such directors, were not guilty of negligence.

It is agreed that the obligation which they came under in accepting their directorships, as expressed in the abstract terms of the law, was the exercise of good faith and ordinary diligence and care in the performance of their duties, including that of reasonable oversight and supervision. *Lowndes* v. *City National Bank*, 82 Conn. 8, 16, 72 Atl. 150. It has been said, and counsel for these plaintiffs have contended, that this ordinary diligence and care which the law demands of bank directors is

such diligence and care as an ordinarily prudent man would exercise in his own business. *Hun* v. *Cary,* 82 N. Y. 65, 72; *Marshall* v. *Farmers & Mechanics Savings Bank,* 85 Va. 676, 684, 8 S. E. 586. Clearly that is not the true rule. The true rule is that which prevails under all other conditions, and that is, such diligence and care as the ordinarily prudent man would exercise under like circumstances. Translated into terms applicable to the situation in which a savings-bank director finds himself placed, that means that he owes the duty of exercising such a degree of diligence and care as an ordinarily prudent director of similar institutions, similarly circumstanced, would exercise under similar conditions. The conditions which surround a man in his own business are not the same as those in which a bank director is placed, and the degree of care is not, therefore, to be measured by the same standard. *Swentzel* v. *Penn Bank,* 147 Pa. St. 140, 149, 25 Atl. 403, 415; *Savings Bank of Louisville's Assignee* v. *Caperton,* 87 Ky. 306, 318, 8 S. W. 885; 1 Michie on Banks & Banking, p. 335.

I do not understand that my associates dissent from this proposition as defining the extent of the defendants' legal duty. This is the standard which the law sets up. The trial court recognized it, and measured the defendants' conduct by it. There can be no manner of doubt upon that point.

For the rest, the question before the trial court was one of fact, pure and simple. The law goes no further than to prescribe the abstract rule of duty. It establishes a standard that is applicable to cases like the present. It is, and of necessity must be, an abstract one. It cannot furnish a specific, concrete one for practical application under the infinite variety of circumstances which may arise. This latter standard to be applied to any given case, which, for want of a better word, I may call the concrete or practical standard, is

one which can only be derived from an inquiry as to the course of conduct of ordinarily prudent men under like circumstances. That inquiry, and the determination thereby of the concrete standard by which conduct under investigation is to be measured, involves nothing else than an inquiry of fact and a conclusion of fact. This we have held too often to admit of further discussion. *Farrell* v. *Waterbury Horse R. R. Co.*, 60 Conn. 239, 250, 21 Atl. 675; *Bunnell* v. *Berlin Bridge Co.*, 66 Conn. 24, 33, 33 Atl. 533; *Lawler* v. *Hartford Street Ry. Co.*, 72 Conn. 74, 81, 43 Atl. 545; *New Haven Trust Co.* v. *Doherty*, 74 Conn. 353, 356, 50 Atl. 887; *Briggs* v. *Spaulding*, 141 U. S. 132, 152, 11 Sup. Ct. Rep. 924.

The majority of my associates say that the trial court erred in applying too low a standard of duty. As it is beyond question that it applied the correct legal standard, that charge can only mean that the court's concrete standard, drawn by it from its inquiry into the course of conduct of ordinarily prudent men under like conditions, for use in testing the defendants' conduct, was too low, or, in other words, that its conclusion of fact upon that subject was erroneous. It seems to me that at this point the majority have fallen into error, and been led into an unintentional transgression of the powers of this court in matters of fact.

I am confirmed in that notion by the introductory passage of that portion of the majority opinion which deals with the subject now under discussion. It is there said that the first question presented by the appeal is whether the trial court's finding of reasonable care was one purely of fact, or one of fact and law. Then follows a discussion which seems to me to confuse the legal rule of duty and the concrete standard of conduct deducible from the application of that rule to the circumstances of a given case.

Further than that, it seems to me that in portions of

the discussion there is a distinct departure from the well-established rule of duty already referred to, and which I do not understand that it is desired to repudiate. For example, it is said that "the standard of reasonable care required by law of bank directors is affected by their fiduciary position, by the nature of the business, and by the fact that, in accepting the office, they hold themselves out as reasonably competent and reasonably qualified to perform the duties of the office." If by this is meant, as it apparently is, that the fact that the position which savings-bank directors occupy is a fiduciary or *quasi*-fiduciary one, and that by consenting to serve they hold themselves out as undertaking to bring to the discharge of their duties reasonable competency, add something to the requirement that they exercise that degree of diligence and care which ordinarily prudent men similarly circumstanced exercise, the statement is not correct. It is by reason of their consenting to come into the fiduciary or *quasi*-fiduciary relation, and to undertake the performance of the duties imposed upon directors, that they bring themselves under the obligation of exercising the care and prudence used by ordinarily prudent men similarly circumstanced. The extent of this obligation, however, is measured, and fully measured, by the ordinary conduct of ordinarily prudent men similarly circumstanced. The legal rule of duty when ordinary care and prudence is required is a universal one. It is the same for all men in all positions and under all circumstances. It is to exercise that degree of care which ordinarily careful and prudent men would exercise under like circumstances. This is the single simple test, and any attempt to deviate from it, or to recognize variations, can only serve to befog the inquiry to be made, and to obscure the fact to be determined.

If I misinterpret this portion of the opinion, and its

purpose at this point is to emphasize the fact that the quality of conduct in the concrete, which the application of the legal rule calls for, is or may be different or very different for savings-bank directors than for men in other spheres of life, it but states a commonplace of universal application. The ordinarily prudent man acts differently, and with a different degree of care, under differing conditions, and the rule recognizes and is based upon that fact as its fundamental principle. The course of conduct of such a man in the concrete changes with the circumstances, but the legal rule of duty remains unchanged. It was the same for these directors in the performance of their duties at the bank as it was in their business or their pleasures, and as it is for all in every walk or activity of life; and there the subject as a matter of law is left.

It was incumbent upon these directors, acting in conformity with the rule of law, to conduct themselves as others circumstanced like them would, in the exercise of ordinary prudence, act. The matters of present significance, however, are: (1) that what kind of conduct this would call for is a question of pure fact; and (2) that the determination of that matter, as furnishing a test to be applied to these defendants' conduct, being one of fact, is one which cannot rightfully be disturbed by this court unless it could not have been arrived at without the violation of the rules of logic or through some disregard of legal principles. *Farrell* v. *Waterbury Horse R. R. Co.*, 60 Conn. 239, 250, 21 Atl. 675; *Lawler* v. *Hartford Street Ry. Co.*, 72 Conn. 74, 81, 43 Atl. 545; *New Haven Trust Co.* v. *Doherty*, 74 Conn. 353, 356, 50 Atl. 887. No disagreement of opinion as to what ordinarily careful men in the defendants' places would have done can afford us justification for substituting ours for its. I fear that this is what the majority have done.

In the present case, as in most where the right of action is founded upon negligence, we have a situation where the ascertainment of the concrete measure of duty, and the determination of whether that duty had been performed, are so bound up together as to be practically inseparable. The only practical way of discovering the standard arrived at is by the indications furnished by the ultimate conclusion that the conduct in question did or did not measure up to it. Such cases present only an unreviewable question of fact save, of course, where the conclusion reached is one which could only be reached in violation of the rules of logic or reason. *Lord* v. *Lamonte*, 72 Conn. 37, 39, 43 Atl. 491; *Fox* v. *Kinney*, 72 Conn. 404, 407, 44 Atl. 745; *Murphy* v. *Derby Street Ry. Co.*, 73 Conn. 249, 253, 47 Atl. 120; *Dinini* v. *Mechanics Savings Bank*, 85 Conn. 225, 230, 82 Atl. 580.

Applying these well-established principles to the present situation, we are bound to remember that the question before us is whether we are prepared to pronounce, and justified in pronouncing, a judgment of unreasonableness upon the conclusion of fact of the court below, that the defendants were not negligent. No disregard of legal principles is discoverable, and we are driven, if error is to be found, to the extreme indicated. As one member of the court I not only find myself unable to pass such a judgment of unreasonableness, but am firmly convinced that the trial court's conclusion was the reasonable and proper one.

It is charged, and the majority of the court hold, that the defendants failed to exercise that degree of care which the law required of them. Ignoring for the moment the importance which the law attaches to the trial court's conclusion that they did exercise such a degree of care, let us examine the matter entirely independently, and as though the question passed upon

by the court below was before us upon the facts found for our original determination. Such an examination requires that we have clearly before us both the circumstances in which the defendants were placed and their conduct under them. Without knowledge of the first set of facts one cannot arrive at the concrete standard of what would be the conduct of ordinarily prudent persons similarly circumstanced; without the second, it is impossible to know what to bring to the measure of that standard when ascertained. The finding contains a very full statement of the facts, the more significant portions of which it is worth while to bring together that we may have before us an adequate picture of the situation.

The institution in question is a country bank of moderate proportions, located in a community of comparatively small population. Incorporated in 1871, its deposits in 1880 had reached only $60,000. At the time of the discovery of its former treasurer's irregularity, in January, 1912, they had mounted to between $500,000 and $600,000.

The men who organized the bank and have served in its directorate, including the defendants, were representative men of the community, who were interested in its welfare, and acted in the direction of its affairs from a sense of public duty, and without compensation. They were honest, prudent men who had successfully conducted their own affairs and gained the respect and confidence of the community. They were unaccustomed to deal with large financial affairs, and were not expert bookkeepers, but they were fully competent to manage the bank with prudence and economy. Their performance of their duties was in no sense perfunctory. Their formal meetings were frequent, and they often met informally to discuss the affairs of the bank. They were scrupulously regular in their at-

Lippitt *v.* Ashley.

tendance. At their meetings they discussed and passed upon all investments, and these have at all times been of a high order. So well were they made, that the bank has had the unusual record of never having had to take property by foreclosure.

In the further performance of their duties the directors chose for the successive presidents of the institution, four in number, leading men of affairs of the town, who were proper selections for that office. For treasurer and managing officer they selected in Converse, a resident of the town who had been successful in business, was possessed of the reputation of being a capable business man, and was universally trusted and respected. All his days he was honored with public office of responsibility and entrusted with the execution of private trusts, and so highly regarded was he that the entire community suspended business at the time of his funeral, and joined in paying respect to his memory. "No one could have been chosen to that office who had a higher reputation for honesty, carefulness, faithfulness and efficiency."

Converse was the only male employee in the bank, save for a short time, and kept its books. The other employees were women. No one of these assistants, as far as appears, was a competent or experienced bookkeeper. A double-entry system of bookkeeping was used, and it was a proper and the customary one for banks of its kind. The practice of committing the management and the keeping of the books to one person was a customary one in banks of its class, and proper. The method employed in the conduct of the business was that which prevailed in other banks of the State of similar character and size. In such banks the treasurer customarily keeps the books, and proves the balances, and the directors rely upon him and his reports, in connection with the reports of auditors and

the examinations of the bank commissioners, for their knowledge of the bank's condition. "It is not customary for directors of other banks to instruct their treasurer how to keep his books, nor to instruct the auditors appointed in accordance with law how to make their audit."

In the early days of the bank a quarterly, and later a semiannual, audit was provided for by a by-law. In 1877, and before Converse's peculations began, a statute was enacted imposing upon the directors the duty of appointing auditors from outside the management "who shall examine the books, accounts, and securities belonging to such bank, and make a sworn statement showing the true condition thereof on the first day of October in each year." Pursuant to this statute the directors annually appointed as auditors "experienced and careful men of affairs and expert bookkeepers, who acted as bookkeepers in the manufacturing establishments of the town." Several different sets of men were thus appointed, and the appointees were honest, reliable and capable of making careful audits. They were men who were themselves substantial depositors, and upon whose reports the directors had a right to rely. The auditors so appointed made examinations and reports at least twice, and sometimes three or four times, each year. These reports all showed the bank to be solvent, its dividends declared earned, and its condition sound.

The bank commissioners of the State, as provided by statute, examined the bank semiannually during the whole period covered by Converse's peculations. They found and reported that its condition was as shown in the statements of the treasurer and auditors. The directors knew of these examinations and the reports made thereon. These reports, as well as those of the auditors and statements of condition as made

by the treasurer were, from time to time as called for, laid before the directors, and discussed and considered by them with care. At various times five of these commissioners orally commended the condition of the bank to individual directors, who reported to the board the favorable comments made.

No one of the defendants during the period of their respective directorships ever personally attempted to audit the books of the bank, or to take a trial balance therefrom, or to give directions to the treasurer as to how he should keep his books, or verify them, or to instruct the auditors as to the character or methods of the audit they were expected to make, or to examine them as to the character of those made and the methods employed in making them. They believed that both the auditors and bank commissioners made their examinations with care, made such verifications of the books as were necessary to disclose the true condition of the institution and prove their correctness in appropriate ways, and had no reason to suspect otherwise. No changes in bookkeeping methods were ever suggested by the bank commissioners or auditors.

This record of the conduct of these defendants, as detailed in the finding, is not one which reveals a group of dummy directors content with doing as little as possible and surrendering all real responsibility to officers and appointees. These men were devoted to the interests of the bank, gave freely of their time and thought to it without compensation, chose for the immediate administration and supervision of its affairs men of the highest quality, capacity and trustworthiness, and appointed to oversee the financial accounts of these men others possessing similar qualifications. There is very much in their record that is highly commendable. So commendable is it that the most captious critic has been able to point to but two matters

as involving any shortcoming whatsoever on their part. These are: (1) a failure to require trial balances to be taken, and (2) a claim of dereliction in respect to audits. As to all things else their slate is confessedly perfectly clean. It is, of course, true that good conduct in most respects cannot excuse laxity in others, even though few. But in the presence of a record of worthy conduct such as these men are able to show, it behooves one to be careful not to condemn for misconduct without justification.

With respect to these two criticisms it is worthy of note that both concern closely related matters of bookkeeping—details of the business which directors are not called upon to perform personally, but are expected to commit, and may properly commit, to appointees. They do not lie in the field of the personal activities of directors. The directors of this bank were not required to spend their time in a personal examination and verification of its books. They were not called upon to qualify themselves to do so, nor to become expert bookkeepers. Their undertaking by the acceptance of their positions that they possessed ordinary competency therefor did not go to that extent. Ordinarily competency for directorial supervision does not imply capacity to personally do all things that may come within the range of the business of the corporation. Neither does the duty of supervision which a director takes upon himself require of him personal attention to the details of the business. His duty in these matters is confined to reasonable care in the selection of fit agents and a reasonable regulation and oversight of those selected. *Warner* v. *Penoyer*, 33 C. C. A. 222, 226, 91 Fed. Rep. 587, 590; *Dovey* v. *Cory*, L. R. (1901) App. Cas. 477, 485, 486.

The majority opinion holds that the defendants failed in their duty in that they did not require trial

balances to be taken. It is said that in this they failed to conform the bookkeeping methods of the bank to the established usage of similar institutions, and that, therefore, they were negligent. Let us see what this usage thus relied upon was. It was none other than that the treasurers of the respective banks have trial balances taken at periods from once in three months to once in two years. This, read in connection with the further finding that this bank followed the usual method of conducting its business employed in other banks of this State of its size, and that in such banks the treasurer keeps the books and proves the balances, shows (1) that the custom is for the treasurer, and not the directors, to cause the trial balances to be taken, and (2) that the treasurer himself takes them.

As I read the majority opinion I get the impression that it overlooks, at times at least, the true character and office of a trial balance. A trial balance, as I understand, is, as its name indicates, only an incidental process for proving the correctness of the ledger in certain respects. It is resorted to by bookkeepers and auditors as furnishing a test. There are other tests, more or less convenient and satisfactory, according to the conditions and the purpose of the investigator, but, as applied to the double-entry system of bookkeeping, it is so admirably adapted to a verification of the entries upon the ledger, both as to their amount and their entry upon the right side, that it has a large use for that purpose. It may contain the material from which a balance sheet or statement of condition may be made; but it is neither, and there is nothing in a statement of condition to indicate, even in the most remote way, whether or not a trial balance, or any other test, was used in verifying the books from which it was drawn. In its quality a trial balance is in no respect different, although more far-reaching in its

indications, than the addition a second time of items found upon the pages of the ledger. Whether either test of correctness has been applied can be told by no one save the man who applied it, unless he leaves some external evidence of the fact, as, of course, he may, as by preserving his trial balances. His labors will not be shown in the result, save as they may be reflected in its correctness.

Returning now to the charge that the defendants were neglectful of duty in that they did not conform the usage of their bank to the prevailing custom in similar institutions of having trial balances taken, that means, as we have seen, of having such balances taken by the treasurer, who was also the bookkeeper. This bank presented the customary situation in institutions of its size. The treasurer was the bookkeeper, and he was the man who, prior to the audits, gave the books such verification as they had. Conformity to this usage, upon which so much stress is laid, would have amounted to this: that the man who was guilty of the peculations, and of the falsifications of the books to conceal them, would have taken the trial balances. These tests would have disclosed to him nothing he did not already know, and it is a fair assumption that he would not have heralded as a discovery proof of his criminality thus gathered. It is too apparent for argument that Converse might have taken a trial balance every day for the whole period of his embezzlement without any unknown fact being brought to his mind or to the knowledge of any director, officer, or auditor of the institution. In other words, compliance with the usage would have been an idle ceremony, and led to no useful result.

Upon what ground, then, can these defendants be liable for failure in this regard? One is only liable for the consequences of his shortcomings. Negligent omissions of duty do not entail liability for that which

performance of duty would not have been calculated to prevent. Before liability for negligence can arise there must be disclosed some relation of cause and effect between the negligence and the loss or harm. This elemental principle is well brought out in *Warner* v. *Penoyer*, 33 C. C. A. 222, 226, 91 Fed. Rep. 587, 591, where it was attempted to hold directors for the default of a bank cashier. The court well says: "Before they can be made responsible for losses which have occurred through the mismanagement or dishonesty of the cashier, it must appear that such losses resulted as a consequence of the omission of some duty on their part." It cannot be said that the losses suffered by this bank through Converse's irregularities resulted as a consequence of his not having taken, or being required to take, trial balances, or that such taking or requirement would have contributed in the least to deter Converse in his wrongdoing.

The majority opinion supplements the charge against the defendants by the statement that they never asked for or saw a trial balance. It will be noted that this enlarges the usage whose nonobservance is made to furnish evidence of guilt. No usage on the part of directors of other institutions of having trial balances laid before them for consideration is found, and, if so, what possible virtue could there have been in having Converse, the defaulter, present such a paper to his board? He could as easily prepare a false trial balance as a false statement. The setting of a thief to catch a thief may promise results under some conditions, but surely that promise is wanting when both the thief and the deputed catcher are the same person. The trouble with the argument of the majority opinion in this matter, as it seems to me, is that it sees a virtue, as providing a means of either detection or prevention of Converse's peculations, in that which by no possibility

could possess such virtue. Trial balances made or produced were bound to result in nothing as long as their making and production remained in Converse's hands.

I must confess myself at a loss to explain why so much stress has been laid by plaintiff's counsel and the majority of the court upon this matter of trial balances. The court finds, and it is apparent, that a resort to any one of a half dozen other equally simple and available tests would have as surely revealed the irregularities in Converse's books as the taking of a trial balance. Take one, for example. The simple expedient of footing the deposits, as shown in the individual ledger, would have shown at once that the entries in the general ledger were false, and the item of deposits in the bank's statements fictitious. It is found that it was customary for the treasurer of a savings-bank to apply this test. It may safely be presumed that Converse never conformed to this usage. He didn't need to. He knew the discrepancy already. Why are not the directors liable for their failure to see that this usage was observed? The answer is, of course, obvious, and it is precisely the same answer that must dissipate the claim that they are liable by reason of their noncompliance with trial balance usage. It is, that compliance would have disclosed nothing, and availed nothing, in the way of discovery of the true character of Converse's books and his statements of condition.

It is apparent that the only trial balance worth anything as a means of detecting Converse's peculations would have been one taken by some other person than he competent to perform the task, and that, in this small institution, would have meant some one outside of the bank's working force. No custom in similar institutions of having that done, save as it was involved

in audits, appears. We are thus brought to a consideration of the second charge, that the defendants were negligent in respect to audits, either in relying upon those made, or in not requiring others to supplement them, or in not investigating as to the methods employed in making them, or in not instructing the auditors as to the methods to be employed by them.

The finding shows that there were at least four examinations and audits of Converse's books each year. Two of these were made by State officers specially charged with the duty of savings-bank examinations, and presumably competent. The remainder were made by experienced and careful men of affairs and expert bookkeepers, who were honest and capable of making a correct audit of an institution such as this bank was. These defendants and their associate directors believed, as the finding states, that these examinations and audits were made with thoroughness, and that the tests necessary to verify correctness of the books and statements were made, and they had no reason to suspect otherwise. Thus believing, and having the faith that they, in common with all the community, had in Converse and in the correctness of the statements and reports that he made, they rested satisfied. They made no personal examination of the books, ordered no further audits or examinations, gave no instructions to auditors as to methods to be employed, and did not examine them as to those employed. The issue is thus a narrow one. Did they or did they not perform their full duty of supervision and oversight in stopping where they did, or was the duty imposed upon them of doing some one or more of these last-mentioned omitted things which are now charged against them as misconduct?

My difference with the majority of my associates upon this issue is not so much one of principle as of

conception as to what the examinations and audits
made presumptively evidenced, and what the directors
were entitled to assume upon the strength of them.
The audits, made as of October 1st of each year, pur-
suant to the Act of 1877, were appended to a report
made out upon a printed form prescribed by the bank
commissioners, and therein the auditors certified that
they had made the examination required by law and
found the condition of the bank as contained in the
report. The other audits, made for the benefit of the
directors, were appended to a statement of condition,
and the certificate was that the auditors had examined
the books and vouchers of the bank and found the
statement correct. The bank commissioners' semi-
annual examinations were made under the statute,
which required a visit to and examination of the bank
to ascertain whether it had been managed according
to law, and a report to the Governor of the condition
of the banks so examined.

The majority opinion, referring to the auditors'
certificates, says that these examinations and conse-
quent reports did not purport to involve, or to be based
upon, an examination of the books of the bank "ex-
cept to see that the figures in the treasurer's statement
agree with those appearing on the face of the books,"
and that they did not "purport to be an audit or ex-
amination to see whether the books were correctly kept,
or whether they agreed among themselves." Although
the opinion, as I recall, makes no reference to the ex-
aminations and reports of the bank commissioners,
I presume that they would be disposed of by a some-
what similar criticism. If I believed that this charge
was well made, and either that the examinations and
audits made by the State's officers and auditors ap-
pointed by authority of statute for the purpose of as-
certaining the true condition of the institution were

intended to be the perfunctory and superficial performances thus described, or that the reports and certificates indicated that they were based upon such examinations and audits, I should be bound to agree with the majority in their conclusion that the directors of this bank were not justified in relying upon them without further investigation, examination or inquiry. I agree entirely with the admirable statement in the abstract of the majority opinion as to the duties of directors. I presume I should not disagree with the majority in the application of the abstract to the concrete, if the concrete situation was suceptible of but one construction. Apparently, however, that is not the case here. At least we do differ widely upon this vital concrete matter as to what these examinations and audits and the reports and certificates thereof reasonably implied in the way of real examination and audit, and what, therefore, the directors were reasonably justified in assuming therefrom. Here, I conceive, we come upon the crux of this case, and I must confess my inability to see any sort of foundation for the premise upon which the argument of the majority rests.

We may safely assume, I take it, that our statutes contemplate examinations by bank commissioners and audits by auditors which are worth something, and do not contemplate perfunctory performances, bearing that name, which are not calculated to reveal the true condition of the institutions. That necessarily implies examinations and audits in the course of which those conducting them resort to such expedients and the use of such comparisons, verifications and tests, trial balances or other, as experience shows are reasonably necessary to discover the truth or falsity of the books from which the statements of condition are drawn. The true condition of a bank cannot be ascertained with reasonable certainty, or a certificate of its condi-

tion be fairly given, until that is done. Unless we are prepared to hold that our statutes provide for something more than perfunctory, superficial and good-for-nothing ceremonies which could serve no possible purpose but to deceive, we must hold that they look to examinations and audits involving those incidents which have the promise of fruitful results in ascertaining the truth.

The assertion of the majority opinion, already quoted, as to what the certificates of audit purport to involve in the way of the examination of the books must, therefore, if it has any foundation, find it in the terms or attending circumstances of the several certificates of audit which were made in the present case. Of them the majority opinion says that they disclose on their face that the examinations were directed "to the single purpose of ascertaining the assets and liabilities of the bank as shown on its looks, and not to the purpose of ascertaining whether the statement of liabilities to depositors as shown in detail by the depositors' ledgers agrees with the statement of total deposits as shown on the other books."

I am at loss to discover wherein the auditors' certificates, or anything about them disclose, or tend to disclose, that the auditors did anything else than their full duty under the law in auditing the books of the bank. The statute required that they make a sworn statement showing the true condition of the institution examined. In the present case they, in the official audits, certified under oath that they had made the examination required by statute, and found that the condition of the bank was as stated. What is there here of a suspicious character, or to indicate that the auditors had departed in any way from the strict line of their duty? In the unofficial audits they certified that they had examined the books and vouchers, and

found the appended statement of the treasurer correct. I fail to discover here anything to indicate or suggest that they had examined only a part of the books and vouchers, or that their certificate of correctness was based upon anything other than an adequate examination.

The annual reports of the bank commissioners certainly are not open to criticism as suggesting lax or irregular methods of examination. The statement of the opinion last quoted contains a concession that the certificates of the auditors on their face implied that there had been an examination for the purpose of ascertaining the assets and liabilities of the bank as shown on its books. Here again I am at a loss to conceive how the extent of a bank's assets and liabilities as shown on its books can be ascertained without an examination of all its books, and an inquiry as to their correctness and their agreement among themselves. Surely it cannot be determined without an examination to discover whether or not entries in the books speak truth or falsehood, and what the fact which they speak is, and an examination involves something more than a perfunctory audit which in reality amounts to nothing.

It is said that the several certificates of audit were attached to statements in the handwriting of the treasurer, and that this fact gave to the audits a suspicious character so that they ought not, in the exercise of reasonable prudence, to have been trusted. I wonder why. I venture to think that the vast majority of such certificates are endorsed upon or attached to statements prepared by some officer or bookkeeper of the audited institution, and not by the auditors themselves. And what possible impropriety there is in the statement being so prepared and presented as the basis of the audit I fail to discover. Neither can I imagine how the duty of the auditors in the matter

of verifying and testing the correctness of the statement and of the books from which it was drawn, or, to use the language of the opinion, "of finding out for themselves," can be conceived to be reduced by the furnishing of such working basis.

I find my only explanation of this suggestion in the statement of the opinion in this connection that it is clear that these statements of the treasurer so submitted were not, and did not purport to be, based upon trial balances. Of course they were not trial balances. They did not purport to be. Of course they did not purport to be based upon such balances. I wonder if there ever was one that did, or that conveyed information that a trial balance had been taken to verify the ledger entries from which it was taken? The statements were just what they purported to be, save that some of their items were false. Whether they were true or false was the very thing the auditors were appointed to discover. An accompanying trial balance from Converse's hands would not have helped in the discovery unless verified. Nothing which Converse was capable of producing could be self-verifying. Verification of whatever came from him, or, for that matter, from any officer or servant of the bank, was the essential thing in an audit. The statements furnished fit subjects for such verification, and they were before the auditors for that purpose.

The opinion says that "to any one who knew that they were in the handwriting of the treasurer, they would fairly indicate that the auditors had verified the treasurer's statement of the amount of deposits, and had examined the books and accounts . . . for that purpose," and that they "would not necessarily or reasonably involve anything more than inspection of the figures in the deposit and withdrawal registers and of the total deposits as stated in the general ledger."

My speculations as to how that verification could be made without a real examination and audit leave me still in the dark, and I remain in the dark as to how the work of auditors, who could certify as these did, was altered in substance by having a statement furnished them by the treasurer as a basis for their investigation.

Here is my radical difference with my associates. I cannot conceive that our statutes contemplate or authorize anything less than real examinations and audits which are worth while. I cannot conceive that it was intended by our legislators that the reports of the results of such examinations and audits should not be deserving of credit. Neither can I conceive of any reason why the reports in this case possess any earmark indicative of their not being deserving of the credit which should attach to them. It must be that our statutory examinations and audits call for, and necessarily involve, such real examination and comparison of books and accounts and the employment in respect to them of such recognized tests, trial balances or other, as are reasonably necessary to discover their truth or falsity in respect to the financial condition of the institution, and that the announcement of result in certificate or report, when made in ordinary and appropriate language, imports that it is made upon the strength of such examination, comparison and test. In no other way can our statutes be justified. Auditors and examiners may neglect to pursue the proper course and take the necessary precautions, but that is their fault and not the fault of the law. The law expects of them different conduct, and there is nothing in the history of our statute that suggests even remotely anything to the contrary.

The significance of this distinction between my view and that of the majority is important in its bearing

upon this case. Upon their view these defendants had no right to assume, however competent the examiners and auditors might be, that real examinations and audits calculated to reveal the true condition of the bank and the correctness of its books had been made, and to go on without further precautions being taken. Upon my view they had every right, in view of the character and capacity of those who had examined and audited it, to assume, and in the absence of knowledge or suspicion to the contrary to act upon the assumption, that at least four examinations and audits worthy of the name had been annually made. They had a right to assume, and to act upon the assumption, that as incidents of such examinations and audits such tests as were reasonably necessary to disclose the accuracy or inaccuracy of the books and the honesty or dishonesty of the care of its funds, trial balances or other, had been applied in the process of these examinations and audits. In so far as trial balances, or any other tests of correctness, were reasonably necessary to a proper audit, they were justified in assuming that they had been resorted to. In the absence of suspicion, or reasonable ground for it, they were under no obligation to convert themselves into detectives to spy upon the work of the auditors, or to delegate others to do so, or, assuming them to be competent, to examine them as to their methods, or to issue directions as to those methods. The matter of audits is one which directors, in the performance of their duty of supervision, may properly delegate, and, having delegated it to competent, trustworthy and experienced persons, they are, in the absence of knowledge or suspicion, or reasonable ground for suspicion, to the contrary, justified in assuming that the delegated duty is faithfully and properly performed. *Dovey* v. *Cory,* L. R. (1901) App. Cas. 477, 485, 486; *Warner* v. *Penoyer,* 33 C. C. A. 222, 226, 91 Fed. Rep.

587, 591; *Savings Bank of Louisville's Assignee* v. *Caperton,* 87 Ky. 306, 319, 8 S. W. 885; 2 Thompson on Corporations (2d Ed.) § 1266. Personal confidence still has its place in the affairs of this world, and must continue to if success is to crown human effort.

In this connection the findings of fact made by the court below are important. It is found that reasonable care on the part of the auditors required them to make a "reasonable effort to verify a reasonable proportion of the footings in the registers, and that they make a reasonably careful audit of the registers, and that they make a reasonably careful audit of both the deposit and cash account in the general ledger, and that they make a reasonably careful audit of at least some portions of the daily balance books, and that they make such comparison in the several books as might be requisite to that end." It is found that the defendants believed, and had no reason to suspect otherwise, that such audits, and thorough ones, were being made. It is found that if they had been made, Converse's irregularities would surely have been revealed. It is found that the directors had a right to rely upon the audits made. Can we say as a matter of law that this last proposition is not true? If not, what becomes of the main premise in the majority opinion?

The majority opinion suggests that these examinations and audits should, in the exercise of due care, have been supplemented by others. If the four or more a year were not sufficient in number, yes. If sufficient in number, what need of adding to them? Upon the theory of the majority as to the character of the statutory audit there would, of course, be a good reason for the requirement of others; upon mine none whatsoever. Apparently the directors could not have been expected to select more competent persons to make the additional audits, and no more efficient methods could have

been anticipated than those the statutory proceedings contemplated.

Were the four, five or six audits a year actually made insufficient in number, and were the directors derelict in duty in not requiring more? I fail to see why, assuming that those made were reasonably efficient, the number was inadequate, or why, assuming that they were reasonably believed to be efficient, that more should, in the reasonable exercise of the supervisory duty of the directors, have been demanded.

The majority opinion states that the defendants' argument assumes, and wrongly so, that the statutory audits are in lieu of those called for by common-law requirements. I make no such assumption. I do assume, however, that where the statutory and official audits and examinations are sufficient in number and comply with all reasonable requirements, others in addition are not demanded, and that directors, reasonably believing that those made satisfy those conditions, are not derelict in duty in not requiring others. This I conceive to be a sound assumption based upon simple common sense. An examination or audit certainly cannot be any worse or more open to suspicion for being official or directed by statute.

It is all too evident that some one other than the criminally guilty party contributed by negligent conduct, and grievously so, to the unfortunate losses of this bank. It is easy to discover that there must have been some strangely lax auditing, but that fact by no means suffices to impute negligence to these directors whose duty was that of general supervision and oversight, and not of detail management or bookkeeping. The mysteries of business defalcations will probably never cease to astonish us. The mystery of how this one continued as it did for so many years is not the least of them. But the existence of that mystery

does not necessarily make for the defendants' responsibility.

The conclusion of the majority to my mind adds a strange climax to the already strange situation. Successive bank commissioners, some seven or eight in number, covering the whole long period of years during which Converse's peculations continued, examined this bank twice a year, with the distinct purpose of discovering its condition, and found nothing wrong. Expert and experienced bookkeepers in varying groups of two audited its books and accounts twice a year or oftener, and found no flaw in them. All these men, whose special duty it was to detect financial irregularities, failed to detect those of Converse. Now that they are known, it is contended that the directors, having no other than a supervisory duty, failed to exercise reasonable care in the discharge of that duty, and are financially responsible because, forsooth, they did not succeed in bringing to the light of day that which had for years escaped the detecting eye of a very considerable group of men competent and qualified to make detection, and set to the particular task of making it.

Of course such responsibility is logically possible, but practically it would present a striking situation. Is not the explanation of the attitude of those who charge responsibility to be found, in large part at least, in the fact that we now know Converse's misconduct, the manner of it, and the simplicity of the means of discovery. The very simplicity of these means, now known, appears to add force to the charge of negligence, and we are judging them with the advantages proverbially attending what is familiarly known as "hindsight." We see how easy it would have been to detect, and wonder why detection did not come. As regards the auditors and examiners the wonder remains. But

when we turn to the directors we must remember their field of duty, their right of reasonable reliance upon others, that they were compelled to govern their conduct by the aid of foresight only, and that they should be judged with those facts clearly in view and from their standpoint at the time of their action.

I have said nothing concerning the losses through excessive dividend payments. I agree with the majority opinion in holding that liability for these payments, under the circumstances attending them, can only be predicated upon negligence in not knowing the actual condition of the bank when the several declarations of dividends were made. Holding, as I do, that such negligence is not shown, I have no occasion to touch that subject further.

I concur in that portion of the opinion of JUDGE BEACH which deals with the subject of the operation of the statute of limitations.

In this opinion RORABACK, J., concurred.